UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _4/19/2023_

ALVIN L. BRAGG, JR., *in his official capacity as District Attorney for New York County*,

Plaintiff,

-against-

JIM JORDAN, *in his official capacity as Chairman of the Committee on the Judiciary*, COMMITTEE ON THE JUDICIARY OF THE UNITED STATES HOUSE OF REPRESENTATIVES, and MARK F. POMERANTZ,

Defendants.

1:23-cv-3032 (MKV)

**OPINION AND ORDER
DENYING TEMPORARY
RESTRAINING ORDER**

MARY KAY VYSKOCIL, United States District Judge:

The request by Manhattan District Attorney Alvin L. Bragg Jr. for a temporary restraining order, enjoining enforcement of the subpoena issued to Mark F. Pomerantz by the Committee on the Judiciary of the United States House of Representatives, chaired by Congressman Jim Jordan, is DENIED. The subpoena was issued with a "valid legislative purpose" in connection with the "broad" and "indispensable" congressional power to "conduct investigations." It is not the role of the federal judiciary to dictate what legislation Congress may consider or how it should conduct its deliberations in that connection. Mr. Pomerantz must appear for the congressional deposition. No one is above the law.

**BACKGROUND**

On April 6, 2023, the Committee on the Judiciary of the United States House of Representatives (the "Committee") issued a subpoena, directing Mark F. Pomerantz ("Pomerantz"), a former *pro bono* employee of the Office of the District Attorney for New York County ("DANY"), to appear on April 20, 2023 "to testify at a deposition touching matters of

inquiry committed to [the Committee]."  Exhibit 1 ("Ex. 1") to the Declaration of Theodore J. Boutrous, Jr. ("Boutrous Dec.") [ECF No. 12-1].  The subpoena does *not* request that Pomerantz produce any documents.  *See* Ex. 1.

The subpoena was accompanied by a letter from the Chairman of the Committee, Jim Jordan ("Jordan").  *See* Ex. 1.  The letter requests Pomerantz's appearance due to his "unique role as a special assistant district attorney leading the investigation into President Trump's finances." Ex. 1 at 2.  It further explains that Pomerantz has "already discussed many of the topics relevant to [the Committee's] oversight in a book [that Pomerantz] wrote and published in February 2023, as well as in several public interviews to promote [his] book."[1]  Ex. 1 at 2 (citations omitted). Jordan notes that DANY has "acknowledged that it used federal forfeiture funds in its investigations of President Trump,"[2] and that the Committee was considering "potential legislative reforms," such as "broadening the existing statutory right of removal of certain criminal cases from state court to federal court."  Ex. 1 at 2.

The book referenced in Jordan's letter is *People vs. Donald Trump: An Inside Account*, written by Pomerantz and published in early 2023.  *See* M. Pomerantz, *People vs. Donald Trump: An Inside Account* (2023) ("*Inside Account*").   As its subtitle indicates, the book recounts Pomerantz's *insider* insights, mental impressions, and his front row seat to the investigation and deliberative process leading up to the DANY case against former President and current presidential candidate Donald Trump.  Among Pomerantz's observations:

- Within DANY, the case against Trump arising out of payment of so-called "hush money" to Stephanie Clifford was referred to as the "zombie" case.  *Id.* at 200.

- The facts surrounding the payments "did not amount to much in legal terms. Paying hush money is not a crime under New York State law, even if the payment

---

[1] *See* Exhibits E–O to the Declaration of Todd B. Tatelman [ECF Nos. 32-5 to 32-15].

[2] *See* Exhibit 19 to the Boutrous Dec. [ECF No. 12-20].

was made to help an electoral candidate." *Id.* at 40.

- "[C]reating false business records is only a misdemeanor under New York law." *Id.* at 40.

- "[T]here appeared to be no [felony] state crime in play." *Id.* at 40–41.

- "[T]o charge Trump with something other than a misdemeanor, DANY would have to argue that the intent to commit or conceal a federal crime had converted the falsification of the records into a felony. No appellate court in New York had ever upheld (or rejected) this interpretation of the law." *Id.* at 41.

- The statutory language (under which Trump was charged) is "ambiguous." *Id.* at 40.

- "[T]here was a big risk that felony charges would be dismissed before a jury could even consider them." *Id.* at 41.

- "[T]he Trump investigation should have been handled by the U.S. Department of Justice, rather than by the Manhattan district attorney's office." *Id.* at 240.

- "[F]ederal prosecutors would not have to torture or massage [statutory] language to charge Trump with a violation," as DANY would have to do. *Id.* at 240.

- *Federal prosecutors previously looked into the Clifford* "*hush money payment*" *and did not move forward with the prosecution. Id.* at 242 (emphasis added); *see also id.* at 39.

- There is a statute of limitations issue with the DANY case against Trump. *Id.* at 240–41.

- Numerous DANY prosecutors were skeptical about the prosecution of Trump and were referred to internally at DANY as "conscientious objectors." *Id.* at 194.

- The invoices and requests for payment from Michael Cohen in connection with the Clifford payments, in a supposed effort to "camouflage" reimbursements, were made "throughout 2017 (*after* Trump's inauguration as president)." *Id.* at 39 (emphasis added) (parenthetical in original).

- The DANY prosecution team discussed "Michael Cohen's credibility" as being one of "the difficulties in the case." *Id.* at 203.

- *At one point, Bragg* "*commented that he 'could not see a world' in which [DANY] would indict Trump and call Michael Cohen as a prosecution witness.*" *Id.* at 227 (emphasis added).

- While Pomerantz acknowledged Bragg's right to make prosecutorial decisions, Pomerantz viewed himself as more experienced and qualified than Bragg. *Id.* at 218–19. Pomerantz makes a point that he was "finishing law school when Alvin was a toddler." *Id.* at 208.

- Pomerantz resigned from his *pro bono* position at DANY when it became clear to him that President Trump would not be indicted. *Id.* at 248–51; *see also* Exhibit C ("Ex. C") to the Declaration of Todd B. Tatelman ("Tatelman Dec.") [ECF No. 32-3]. Pomerantz "told the DA that he was responsible for a 'grave failure of justice' because he would not authorize Trump's indictment." *Inside Account* at 1.

- Ultimately in March 2023, Bragg did, of course, indict President Trump, "bring[ing] the 'zombie' theory back from the dead once again." *Id.* at 209.

Jordan and the Committee first tried to acquire information from Pomerantz and DANY voluntarily. *See, e.g.*, Exhibit 2 ("Ex. 2") to the Boutrous Dec. [ECF No. 12-2]; Exhibit 11 ("Ex. 11") to the Boutrous Dec. [ECF No. 12-12]; Exhibit 58 ("Ex. 58") to the Boutrous Dec. [ECF No. 12-61]. While the DANY General Counsel offered to "meet and confer" with the Committee "to understand whether [it] ha[d] any legitimate legislative purpose in the requested materials," DANY declined to provide information and instructed Pomerantz not to comply with the Committee's requests. Exhibit 10 ("Ex. 10") to the Boutrous Dec. at 5 [ECF No. 12-11]; Exhibit 12 ("Ex. 12") to the Boutrous Dec. [ECF No. 12-13]; *see also* Exhibit 19 ("Ex. 19") to the Boutrous Dec. [ECF No. 12-20].

On April 11, 2023, Manhattan District Attorney Alvin L. Bragg, Jr. ("Plaintiff" or "Bragg")—one of five local district attorneys for the five boroughs in the City of New York— filed a 50-page Complaint in this Court, naming Jordan, the Committee, and Pomerantz as defendants. *See* Complaint [ECF No. 1] ("Compl."). Bragg simultaneously filed a motion, brought on by an *ex parte* proposed order to show cause, seeking a temporary restraining order and a preliminary injunction (1) enjoining Jordan and the Committee from enforcing the subpoena served on Pomerantz and (2) enjoining Pomerantz from complying with the subpoena, *see*

Proposed Order to Show Cause With Emergency Relief [ECF No. 7]; *see also* Memorandum of Law in Support [ECF No. 8] ("Pl. Mem."). Plaintiff later filed the Declaration of Theodore J. Boutrous, Jr., accompanied by over 60 exhibits. *See* Boutrous Dec.

The first 35 pages of the Complaint have little to do with the subpoena at issue and are nothing short of a public relations tirade against former President and current presidential candidate Donald Trump. The same is true of the vast majority of the exhibits accompanying the Boutrous Declaration. Of note, the Complaint acknowledges that DANY used federal forfeiture funds in investigating President Trump and/or the Trump Organization. Compl. ¶ 78. Moreover, Bragg concedes that DANY was aware that Pomerantz was writing a book about the Trump investigation and asked to review the manuscript pre-publication. Compl. ¶ 90. Pomerantz declined. Compl. ¶ 90; Pl. Mem. 21–22. At heart, the Complaint simply includes two requests for declaratory and injunctive relief directed at the congressional inquiry. The reality is that, as framed, this action is merely a motion to quash a subpoena dressed up as a lawsuit.

The motion for a temporary restraining order was filed without notice to Defendants and before Defendants even were served with the Complaint. *See* Certificate of Service [ECF No. 17]; Waiver of Service [ECF No. 18]. In this Court, Local Civil Rule 6.1(d) dictates that any party seeking an *ex parte* order must submit an "affidavit of good and sufficient reasons why a procedure other than by notice of motion is necessary, and stating whether a previous application for similar relief has been made." No such affidavit was submitted here. Accordingly, the Court issued an Order, declining to enter the proposed order to show cause, directing service on Defendants not only of the motion (with all supporting papers), but also of the Complaint by which this case was initiated, setting a briefing schedule to allow Defendants to be heard, and scheduling a hearing for today to address the motion for a temporary restraining order. *See* Order [ECF No. 13].

Jordan and the Committee filed an opposition brief. *See* Opposition Brief [ECF No. 27]

("Def. Mem."). They argue that Bragg cannot establish a likelihood of success on the merits because Jordan and the Committee are immune from suit under the Speech or Debate Clause of Article I of the United States Constitution. Def. Mem. 5–14. Defendants further argue that the subpoena has at least two valid legislative purposes. First, they contend that the Committee is considering the viability of legislation to protect former Presidents and presidential candidates from politically motivated prosecutions by local district attorneys, such as by permitting those cases to be removed to federal court, out of a concern that such prosecutions "could have a profound impact on how Presidents choose to exercise their powers while in office." Def. Mem. 3. Second, Defendants argue that the Committee is permissibly investigating DANY's use of federal forfeiture funds in the investigation of President Trump, which could potentially influence the outcome of the 2024 presidential election. Def. Mem. 8–9.

Pomerantz filed a "response" to Bragg's motion. *See* Pomerantz Response [ECF No. 30] ("Pomerantz Res."); *see also* Declaration of Mark F. Pomerantz [ECF No. 31] ("Pomerantz Dec."). Pomerantz describes himself as a "nominal[]" defendant. Pomerantz Dec. ¶ 1. He does not oppose Bragg's motion and, instead, joins in the request for an injunction. *See* Pomerantz Dec. ¶ 1 ("I have no objection to the relief that the District Attorney has requested. I consent to that relief, and indeed urge this Court to grant it.").[3] It appears that Pomerantz is content to largely allow Bragg to speak for him. *See* Pomerantz Res. 1 ("These are matters for the District Attorney . . . to argue."); *id.* at 5 ("We defer to the papers filed by the District Attorney on this motion to articulate why the subpoena threatens New York's sovereign power."). Indeed, Bragg's counsel, Theodore J. Boutrous, Jr., filed a waiver of service on behalf of Pomerantz. *See* Waiver of Service [ECF No. 18].

---

[3] Unless otherwise noted, references to "Defendants" in this Opinion refer only to Jordan and the Committee.

The day before the scheduled hearing, Bragg filed an eleventh hour reply brief, not authorized by the Court's Scheduling Order given the compressed time frame in which Plaintiff's motion was brought on. The reply largely rehashes the same arguments made in the moving brief and, for the first time, addresses the Speech or Debate Clause. *See* Reply Brief [ECF No. 41-1] ("Reply"). The reply brief was accompanied by a supplemental declaration attaching sixteen largely irrelevant exhibits, consisting of a hodge-podge of social media postings, news articles, television interviews, pleadings from unrelated lawsuits, and a transcript from the arraignment in the Trump prosecution. *See* Exhibits 60–72 to the Second Boutrous Declaration [ECF Nos. 41-2 to 41-5].

The Court is in receipt of several unsolicited amicus briefs. An assemblage of former members of Congress, former prosecutors, former government attorneys, and academics filed an amicus brief with the consent of Bragg. *See* Letter Motion to File Amicus Brief [ECF No. 34]; Amicus Brief [ECF No. 37] ("First Amicus"). Amici argue that the Committee lacked authority to issue the subpoena and echo Bragg's refrain that the subpoena will "interfere with an ongoing criminal prosecution . . . brought by a state prosecutor." First Amicus 1. A separate group of former state and federal prosecutors filed another amicus brief, again with the consent of Bragg. *See* Letter Motion to File Amicus Brief [ECF No. 40] ("Second Amicus"). These amici assert that the subpoena "seriously challenges . . . the prosecutorial process." Second Amicus 2.[4]

Bragg and his two sets of amici attack what they describe as federal interference in his criminal prosecution. Pl. Mem. 1; First Amicus 3; Second Amicus 3. There is no question that New York, a sovereign state in our federal system, has authority to enforce its criminal laws through its local prosecutors. The Court is mindful of potential federalism concerns. However,

---

[4] The Court also received a "friend of the court letter" from James H. Brady, dated April 17, 2023. *See* Letter [ECF No. 38]. The Court has reviewed and considered all of the unsolicited submissions.

the Court rejects the premise that the Committee's investigation will interfere with DANY's ongoing prosecution. The subpoena of Pomerantz, who was a private citizen and public commentator at the time Bragg indicted Trump, will not prevent or impede the criminal prosecution that is proceeding in New York state court.

## ANALYSIS

### I.     Bragg Has Sufficiently Alleged Article III Standing

A threshold issue in this matter is whether Bragg has standing to maintain this action since the challenged subpoena is not addressed to Bragg or his office. *See All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006) ("[A] district court must generally. . . establish that it has federal constitutional jurisdiction, including a determination that the plaintiff has Article III standing, before deciding a case on the merits."). The subpoena was issued to Pomerantz—*not* to Bragg. *See* Ex. 1. Pomerantz has not filed suit. Although he is named as a defendant, Pomerantz "asks this Court to grant [Bragg's] motion." Pomerantz Res. 1.

Bragg, as the party invoking federal jurisdiction, bears the burden of establishing standing. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

Where a plaintiff seeks to enjoin a subpoena issued to a third party and has "no alternative means to vindicate [his] rights," a plaintiff satisfies his burden of establishing standing. *U.S. Servicemen's Fund v. Eastland*, 488 F.2d 1252, 1260 (D.C. Cir. 1973), *rev'd on other grounds*, 421 U.S. 491 (1975); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *rev'd on other grounds sub nom.*, 140 S. Ct. 2019 (2020) ("[T]here is no dispute that Plaintiffs had

standing in the District Court to challenge the lawfulness of the Committees' subpoenas by seeking injunctive relief against the Banks as custodians of the documents.").

Bragg's stated interest in the subpoena is his claim that permitting Pomerantz to appear will undermine the pending criminal case against President Trump, intrude on the grand jury proceedings, and violate grand jury secrecy laws, among other things. These assertions are all without merit. Since Pomerantz was not at DANY when the grand jury indicted President Trump (and therefore has no information on that subject), *see* Pomerantz Res. 2, the only arguably valid interest Bragg has (to the extent it is not waived, *see infra* Section II.D) is in maintaining the confidentiality of deliberations within the office he now leads.

Determining whether Bragg has any "alternative means to vindicate" his rights is made difficult where, as here, the Court cannot predict what questions will be asked—or whether any rights of Bragg will be implicated. In that vein, Defendants contend that Bragg "has no standing whatsoever to stop Pomerantz from appearing before the Committee to answer . . . questions" that "do not involve purportedly privileged material in any way." Def. Mem. 18.

The Court concludes that Bragg sufficiently alleges standing. Jordan's letter to Pomerantz references "the New York County District Attorney's unprecedented prosecutorial conduct" and Pomerantz's "unique role as a special assistant district attorney." *See* Ex. 1 at 2. These areas of inquiry at least arguably implicate Bragg's interests. Because "general factual allegations of injury resulting from the defendant's conduct may suffice" at the *pleading* stage, the Court concludes that Bragg has established Article III standing sufficient to survive this *even earlier* stage of litigation. *Lujan*, 504 U.S. at 561; *cf. U.S. Servicemen's Fund*, 488 F.2d at 1260; *Deutsche Bank*, 943 F.3d at 635.

## II.    Bragg Is Not Entitled to a Temporary Restraining Order

A.    _Legal Standard_

In the Second Circuit, the same legal standard governs the issuance of preliminary injunctions and temporary restraining orders.  *See, e.g.*, *3M Co. v. Performance Supply, LLC*, 458 F. Supp. 3d 181, 191 (S.D.N.Y. 2020).  To obtain either, Bragg must show: (1) a likelihood of success on the merits, (2) a likelihood of irreparable injury, (3) the balance of hardships tips in his favor, and (4) that the public interest would not be disserved by the issuance of an injunction.  *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).[5]  Like a preliminary injunction, a temporary restraining order is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Where a party seeking a temporary restraining order fails to establish a likelihood of success on the merits, "there is no need to address the other prongs of the analysis."  *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011).  For the reasons outlined below, Bragg has not demonstrated a likelihood of success on the merits.

B.    _The Subpoena Serves a Valid Legislative Purpose_
_and Is Not Ultra Vires or Otherwise Unconstitutional_

Congressional committees have constitutional authority to conduct investigations and issue subpoenas because "each House has power 'to secure needed information' in order to legislate." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927)); *see Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975).  This "power of inquiry—with process to enforce it—is an *essential* and *appropriate* auxiliary to the

---

[5] The Second Circuit has previously instructed that a district court may also grant a preliminary injunction when there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor" *and* "irreparable harm in the absence of the injunction."  *Kelly v. Honeywell Int'l, Inc.*, 933 F.3d 173, 184 (2d Cir. 2019).  Neither party contends that this standard should apply here.

legislative function." *McGrain*, 273 U.S. at 174 (emphasis added). "The power of the Congress to conduct investigations is inherent in the legislative process." *Watkins v. United States*, 354 U.S. 178, 187 (1957).

Of course, this power is not limitless. "[T]here is no congressional power to expose for the sake of exposure." *Id.* at 200. Nor may Congress issue subpoenas "for the purpose of 'law enforcement,'" because that power is assigned "to the Executive and the Judiciary." *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). However, the Supreme Court has described the congressional power of inquiry as "broad" and "indispensable." *Watkins*, 354 U.S. at 187, 215. Indeed, without its investigative powers, "Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Mazars*, 140 S. Ct. at 2031 (quoting *McGrain*, 273 U.S. at 175).

Congress may conduct inquiries "into the administration of existing laws, studies of proposed laws, and [particularly relevant here,] 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'" *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187). Importantly, a congressional subpoena is valid only if it is "related to, and in furtherance of, a legitimate task of the Congress." *Watkins*, 354 U.S. at 187. The subpoena must serve a "valid legislative purpose," *Quinn*, 349 U.S. at 161, and "concern[] a subject on which 'legislation could be had,'" *Eastland*, 421 U.S. at 506 (quoting *McGrain*, 273 U.S. at 177). The role of a court in evaluating a congressional subpoena is strictly limited to determining only whether the subpoena is "plainly incompetent or irrelevant to *any* lawful purpose . . . in the discharge of [the Committee's] duties." *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (emphasis added) (quoting *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943)).

Jordan and the Committee have identified several valid legislative purposes underlying the subpoena. *See* Def. Mem. 15–17. First, they reference the Committee's interest in investigating the use of federal forfeiture funds in connection with DANY's investigation of President Trump. *See* Def. Mem. 8, 17; *see also* Ex. 1 at 2; Exhibit V ("Ex. V") to the Tatelman Dec. [ECF No. 32-22]. There can be no doubt that Congress may permissibly investigate the use of federal funds, particularly where the result of the investigation might prompt Congress to pass legislation changing how such funds are appropriated or may be spent. *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures and on the reliability of those who use public money is bound up with congressional authority to spend in the first place."); U.S. Const. art. I, § 8, cl. 1. DANY has conceded that it used federal forfeiture funds in its investigation of President Trump. *See* Ex. 19; Compl. ¶¶ 78, 81. Defendants represent that the Committee is considering legislation to prohibit the use of federal forfeiture funds to investigate a current or former President. Def. Mem. at 8; Ex. V. This purpose, standing alone, is clearly sufficient to justify the subpoena and thereby to end this Court's inquiry. On the record at the hearing on the motion for emergency relief, Bragg's counsel conceded that the investigation of DANY's use of federal funds is a valid legislative purpose.

Second, Defendants identify the possibility of legislative reforms to insulate current and former presidents from state prosecutions, such as by removing criminal actions filed against them from state to federal court. *See* Def. Mem. 8–9. Congress, of course, has authority to consider, and to investigate, this potential legislative reform. *See Watkins*, 354 U.S. at 187 ("The [investigative] power of the Congress . . . encompasses inquiries concerning the administration of existing laws as well as *proposed or possibly needed* statutes." (emphasis added)); U.S. Const. art. I, § 8, cl. 18 (defining the congressional power "[t]o make all laws which shall be necessary and proper for carrying into execution the foregoing powers"). And Congress also has authority to

investigate legislative reforms to prevent local prosecutions that could potentially interfere with federal elections. *See Mazars*, 140 S. Ct. at 2031 (It is legitimate for Congress to conduct "inquiries into the administration of existing laws" and "proposed laws" that seek to address problems "in our social, economic or political system."). Although Bragg speculates that any such legislation would be unconstitutional, *see* Pl. Mem. 15, that issue is for another day. The Court will not, and indeed cannot, block congressional investigation into *hypothetical* future legislation based on Bragg's speculation that such legislation would not pass constitutional muster. *See Nashville, C. & St. L. Ry. v. Wallace*, 288 U.S. 249, 262 (1933) (courts may not make "abstract determination[s] . . . of the validity of a statute").[6]

C.    *The Subpoena Does Not Implicate the Sovereign Interests of New York*

Bragg suggests that these are not the Committee's *true* objectives. Instead, he contends that the subpoena is *actually* intended "to undermine and obstruct New York's criminal case against Mr. Trump and [to] retaliate against the District Attorney." Pl. Mem. 7. The Court cannot passively accept this contention. The Court is required to presume that a congressional committee's stated legislative object is "the real object." *McGrain*, 273 U.S. at 178 (When it appears that Congress is investigating on a subject matter in aid of legislating, "the presumption should be indulged that this was the real object."). Moreover, even if Bragg's hypotheses about the Committee's *real* motivations were correct, they are irrelevant. "It is not a court's 'function' to invalidate a congressional investigation that serves a legislative purpose." *Comm. on Ways & Means, U.S. House of Representatives v. U.S. Dep't of the Treasury*, 575 F. Supp. 3d 53, 69 (D.D.C. 2021), *aff'd sub nom.*, 45 F.4th 324 (D.C. Cir. 2022) (quoting *Watkins*, 354 U.S. at 200). Indeed, the Supreme Court has instructed that "[s]o long as Congress acts in pursuance of its

---

[6] Plaintiffs make much of *Kilbourn v. Thompson*, 103 U.S. 168 (1880). *See* Pl. Mem. 7–8. But the Court concluded there that the subpoena was "clearly judicial" in nature. 103 U.S. at 192. The same is not true here.

constitutional power, the Judiciary *lacks authority to intervene on the basis of the motives which spurred the exercise of that power*." *Barenblatt v. United States*, 360 U.S. 109, 132 (1959) (emphasis added). Whatever motives may underlie the Committee's subpoena, its "inquiry may fairly be deemed within its province." *Tenney v. Brandhove*, 341 U.S. 367, 378 (1951). That is sufficient to resolve this inquiry.[7]

Plaintiff next urges this Court to apply the "heightened standard of review" outlined by the Supreme Court in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020). Pl. Mem. 13. In *Mazars*, the Supreme Court outlined a four-part analysis relevant in assessing "a subpoena *directed at the President's personal information*." 140 S. Ct. at 2035 (emphasis added). Because "[c]ongressional subpoenas for the President's personal information implicate[d] weighty concerns regarding the separation of powers," the Supreme Court instructed courts considering such subpoenas to: (1) "carefully assess whether the asserted legislative purpose warrants the significant step of involving *the President* and his papers," (2) "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," (3) "be attentive to the nature of the evidence offered by Congress to establish that a subpoena advances a valid legislative purpose," and (4) "be careful to assess the burdens imposed *on the President* by a subpoena." *Id.* at 2035–36 (emphasis added). The Court did not, as Bragg suggests, indicate that the four *Mazars* factors apply *whenever* someone argues that a subpoena "implicat[es] significant separation-of-powers concerns." Pl. Mem. 13. In any event, the same separation of powers concerns are *not* implicated here. The congressional subpoena in *Mazars* was directed at materials pertaining to the *sitting President of the United States*. In contrast, here, the subpoena was issued to a *private*

---

[7] Bragg notes that there is "no prior case in which Congress has attempted to subpoena a state prosecutor for the purpose of extracting information about an ongoing state prosecution." Pl. Mem. 12 (emphasis omitted). Defendants do not dispute this characterization or cite to any such case. However, there also is no prior case in which a former President of the United States has been criminally charged in a state trial court, suggesting *both* parties swim in untested waters.

*citizen* who is *no longer* employed by *any* state government and who has written a book and spoken extensively about the subject matter of the congressional inquiry.  The Court is not persuaded that *Mazars* applies to this case.[8]

Even assuming that *Mazars* were applicable, the Court would reach the same conclusion. With respect to the first factor, Bragg does not demonstrate that the subpoena issued to Pomerantz—a private citizen—will occasion a "constitutional confrontation."  *Mazars*, 140 S. Ct. at 2035 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 389 (2004)).  Congress has the power to compel individuals to testify.  *See Watkins*, 354 U.S. at 187–88 ("It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action.  It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation."); *Quinn*, 349 U.S. at 160–61 ("There can be no doubt as to the power of Congress, by itself or through its committees, to investigate matters and conditions relating to contemplated legislation. . . . Without the power to investigate—including of course the authority to compel testimony, either through its own processes or through judicial trial—Congress could be seriously handicapped in its efforts to exercise its constitutional function wisely and effectively." (citations omitted)).  Indeed, courts have even compelled individuals *actively* employed by the executive branch (who at least arguably hold executive privilege, and some of whom are attorneys obligated to protect privileged information) to appear for congressional depositions.  *See, e.g.*, *Meadows v. Pelosi*, No. 1:21-CV-03217 (CJN), 2022 WL 16571232 at *8–13 (D.D.C. Oct. 31, 2022) (dismissing challenge by White House Chief of Staff to a congressional

---

[8] Despite having discussed *Mazars* in his moving brief, Bragg seeks a second chance at arguing its applicability in his reply brief, contending that the case broadly governs subpoenas "seeking a current or former president's information." Reply 8.  That is clearly incorrect.  In any event, the subpoena does *not* seek a current or former president's information—it seeks *Pomerantz's* testimony.  *See* Ex. 1.

subpoena requesting his appearance for a deposition); *Comm. on Judiciary, U.S. House of Representatives v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008) ("[The former White House counsel] is not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made.  Instead, she must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."); *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 764 (D.C. Cir. 2020) ("The subpoena power is potent.  Each House of Congress is specifically empowered to compel testimony from witnesses and the production of evidence in service of its constitutional functions, and the recipient of a subpoena is obligated by law to comply.").  If those individuals could permissibly be deposed, the same is certainly true here.

Second, the subpoena seeks only Pomerantz's *testimony* (not any documents or materials).  Jordan specifically noted that "*many* of the topics relevant to [the Committee's oversight]" were discussed—voluntarily and extensively—by Pomerantz in his book, as well as in several public interviews.  Ex. 1 at 2 (emphasis added).  The subpoena is not, as Bragg contends, an "overbroad fishing expedition."  Pl. Mem. 17.

Third, Bragg criticizes Defendants' "flimsy evidence" of a valid legislative purpose.  Pl. Mem. 17 (internal quotation marks omitted); *see also* Pomerantz Res. 3.  But Defendants provide evidence that the Committee is investigating the use of federal forfeiture funds, *see* Ex. V, and considering the viability of legislation to protect former Presidents from politically motivated state prosecutions, *see* Exhibit W to the Tatelman Dec. [ECF No. 32-23].[9]  Bragg suggests this evidence

---

[9] Although Pomerantz contends that he has "little if anything to say that will advance the purported legislative purpose," Pomerantz Res. at 5, it is not this Court's role to prescribe the most effective manner for congressional inquiry.  *See Eastland*, 421 U.S. at 509 ("The very nature of the investigative function—like any research—is that it takes the searchers up some 'blind alleys' and into nonproductive enterprises.  To be a valid legislative inquiry there need be no predictable end result.").

is insufficient but his conclusory assertions do not move the needle where, as here, *he* has the burden of demonstrating entitlement to an "extraordinary remedy." *Winter*, 555 U.S. at 24.

Bragg and Pomerantz insist that Pomerantz's testimony cannot advance any valid legislative purpose because, in essence, everything Pomerantz is prepared to say is already in his book and he does not have information about DANY's use of federal funds. Pl. Mem. 11, 22 ("[T]he Committee already has his book."); Pomerantz Res. 2; Reply 5. Bragg and Pomerantz are not entitled to unilaterally narrow the universe of acceptable inquiry to the information and mental impressions that Pomerantz decided to sell in the pages of his book. *See Eastland*, 421 U.S. at 509; *McGahn*, 968 F.3d at 764. If Pomerantz does not have any information about DANY's use of federal funds, he may say so if asked at his deposition.

Finally, Bragg's suggestion that the subpoena "would substantially burden both the New York criminal justice system itself and the District Attorney's Office" is without merit. Pl. Mem. 18. Pomerantz is a *former* prosecutor. He is not involved in the state prosecution in any way. Bragg provides no reason to conclude that a deposition of a former employee would interfere with DANY or any of its ongoing prosecutions. The pending prosecution will move forward in the ordinary course regardless of whether the Committee deposes Pomerantz. Further, Pomerantz was not even employed with DANY at the time President Trump was indicted. Pomerantz admits as much. Pomerantz Dec. ¶ 4. He has stated that the materials in his book would "have no bearing on the litigation of [the criminal prosecution of President Trump]" and would "not prejudice any investigation or prosecution of Donald Trump." *Inside Account* at 278–79. Moreover, Pomerantz emphasizes that he "was *not* involved in the decision to bring the pending indictment against Mr. Trump." Pomerantz Res. 5 (emphasis added). Bragg therefore does not satisfy his burden of demonstrating that the subpoena poses a threat "to a state executive officer, a state judicial proceeding, [or] our federal system itself." Pl. Mem. 14. The Court is further unmoved by Bragg's

purported concern at the prospect of "inject[ing] partisan passions into a forum where they do not belong." Pl. Mem. 19. By bringing this action, Bragg is engaging in precisely the type of political theater he claims to fear.

While the Court need not decide the ultimate merits of Bragg's claims at this stage, serious constitutional infirmities are evident with respect to a lawsuit against Defendants Jordan and the Committee. *See* Def. Mem. 5–9. The Speech or Debate Clause states: "for any Speech or Debate in either House," Senators and Representatives "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. Although the Clause speaks only of "Speech or Debate," it has been interpreted to protect all "legislative acts." *See Doe v. McMillan*, 412 U.S. 306, 312 (1973) (citation omitted). The Clause provides individual members of Congress *and* congressional committees broad immunity from civil suits. *See Eastland*, 421 U.S. at 501–03; *Doe*, 412 U.S. at 313; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982); *Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731–33 (1980). Because Jordan and the Committee are likely immune, Defendants contend that they are necessary parties who cannot be joined and that, under Federal Rule of Civil Procedure 19, the action cannot be maintained. *See* Def. Mem. 10–14. Bragg disagrees.[10] The Court need not resolve this issue, but the distinct possibility of immunity weighs against concluding that Bragg has shown a likelihood of success on the merits. In all events, Bragg confirms in his reply brief that the Court must consider whether there is a "legitimate legislative purpose" for the subpoena he seeks to quash. Reply 3. As explained above, Jordan and the Committee clearly have identified a legitimate legislative purpose, and accordingly the Court will not issue a temporary restraining order.

---

[10] Despite pervasive discussion of the Speech or Debate Clause in the relevant case law and governing authority, Bragg neglected to mention the Clause whatsoever in his moving brief. However, Bragg seeks an opportunity to address this "material issue[]" in his unauthorized reply brief. *See* Letter Motion for Leave to File Reply [ECF No. 41].

D.  *To the Extent They Have Not Been Waived, the Claimed*
    *Privileges Are Not Jeopardized by the Subpoena*

Plaintiff's assertion that the subpoena "seeks grand jury material" and "documents and communications protected by the attorney-client privilege and work product doctrine" does not salvage his motion.  Pl. Mem. 20.  As an initial matter, the subpoena does *not*, as Plaintiff suggests, "seek[]" *any* "material," "documents," *or* "communications."  Pl. Mem. 20.  The subpoena *only* seeks Pomerantz's *testimony*.  *See* Ex. 1.  Although Bragg assumes that the questioning will stray into impermissible territory, the Court declines Bragg's invitation to blindly speculate about what questions might *hypothetically* be posed to Pomerantz at the deposition.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) ("A claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" (quoting *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580–81 (1985)); *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 85 (2d Cir. 2018) ("[F]ederal courts may not give an opinion advising what the law would be upon a hypothetical state of facts." (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937) (internal quotation marks omitted))).

Bragg's throw-everything-at-the-wall approach to privilege is unpersuasive.  As an initial matter, Bragg concedes that "Jordan represents that he *does not* seek information protected by New York's grand jury secrecy laws."  Pl. Mem. 20 (emphasis added).  Although Bragg vaguely asserts that the Committee's "inquiry *could* [still] include questions about grand jury matters," this Court will not quash a subpoena based solely on Bragg's seemingly endless string of "what ifs."  Pl. Mem. 21 (emphasis added).  Even if grand jury secrecy *were* implicated by the subpoena, Bragg's argument makes little sense because Pomerantz was not involved in securing the grand jury indictment.  Pomerantz Dec. ¶ 3.  Indeed, at the time Pomerantz left DANY, "there [had] been no New York state criminal prosecution of Donald Trump."  *Inside Account* at 278.  And even

assuming Pomerantz *did* have some relevant information about the grand jury, Pomerantz is clearly aware that he "cannot disclose details about grand jury proceedings" since he professes that he authored his book in such a way that his "account of the investigation did not violate the grand jury secrecy requirement." *Id.* at 195, 277.[11]

With respect to Bragg's various other claims of privilege,[12] the Court is unpersuaded that judicial intervention is needed to ensure that any privilege that might exist is preserved. Pomerantz is impressively credentialed. He had a long and successful career: he graduated from the University of Michigan Law School, served as a law clerk for a distinguished federal judge, clerked at the United States Supreme Court, was a law professor, worked as a federal prosecutor for the United States Attorney's Office for the Southern District of New York, and as a criminal defense attorney for many years, including as a senior partner at a prominent New York City law firm (Paul, Weiss, Rifkind, Wharton & Garrison). *See Inside Account* at 3–4. In short, Pomerantz is a very experienced, sophisticated, and extremely capable attorney. Moreover, the Committee's procedural rules permit two additional lawyers to accompany Pomerantz to the deposition. *See* Rules of Procedure of the Committee on the Judiciary, R. XI(k)(3) (2023) ("Rule XI").[13] This

---

[11] The Court notes that the secrecy of the grand jury proceedings in the pending criminal case was compromised before an indictment was even announced. *See* Kara Scannell *et al.*, *Donald Trump indicted by Manhattan grand jury on more than 30 counts related to business fraud*, CNN (Mar. 31, 2023, 7:35 AM), https://www.cnn.com/2023/03/30/politics/donald-trump-indictment/index.html.

[12] Specifically, Bragg contends that attorney-client privilege, attorney work product protection, law enforcement privilege, informant's privilege, public interest privilege, and deliberative process privileges are all implicated. Pl. Mem. 21–22. Although Bragg pays lip service to these other so-called privileges, his primary concern appears to be the possibility that Pomerantz might be asked to disclose the "internal deliberations" of DANY, which is a question of work product. *See* Pl. Mem. 21. Work product protection is not absolute, but rather offers a *qualified* protection to "documents and tangible things that are prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). Of course, this is precisely what Pomerantz lays out in *People vs. Donald Trump: An Inside Account*.

[13] Although the rules only permit "personal, nongovernmental attorneys" to accompany Pomerantz, *see* Rule XI, this Court has no authority to rewrite the Committee's rules. *See Exxon Corp. v. F.T.C.*, 589 F.2d 582, 590 (D.C. Cir. 1978) ("[W]e are sympathetic to appellants' concern for safeguarding highly confidential information worth millions of dollars, but for this court on this record to establish any such requirement would clearly involve an unacceptable judicial intrusion into the internal operations of Congress.").

Court is confident that Pomerantz and his counsel are fully knowledgeable about the privilege and confidentiality obligations he owes to DANY and, indeed, are duty bound to ensure they are maintained.[14] *See* Model Rules of Pro. Conduct 1.6 (duty of confidentiality); 1.9 (duties to former clients) (Am. Bar Ass'n 2023); *see also Inside Account* at 279 (noting that Pomerantz "overcame [his] angst" about "describing the inner dialogue of the investigation" because "the Trump investigation was in a class of its own"). The "recipients of legislative subpoenas . . . have long been understood to retain common law and constitutional privileges with respect to certain materials, such as attorney-client communications and governmental communications protected by executive privilege." *Mazars*, 140 S. Ct. at 2032.

Pomerantz is now represented by a team of capable lawyers from his former firm Paul, Weiss. *See* Notices of Appearance [ECF Nos. 28, 29]. Bragg provides no reason to assume those accomplished lawyers would not also be fully knowledgeable about Pomerantz's ethical obligations with respect to privilege and confidentiality. Accordingly, the deposition should proceed in the normal course, question by question, and Pomerantz is free to object, personally or through his counsel, and decline to answer any questions when (and if) appropriate. *See Miers*, 558 F. Supp. 2d at 106–07. Indeed, Defendants confirm that "[t]o the extent that questions are asked that Pomerantz believes he is not permitted to answer, he would retain the ability to decline to answer or to assert an applicable privilege." Def. Mem. 19.

Bragg expresses concern that the Committee's rules permit "a partisan decisionmaker" to "overrule privilege objections" at the deposition and "order a witness to answer a question." Pl.

---

[14] Pomerantz has made it abundantly clear that he will seek to comply with Bragg's instructions and to invoke privilege. *See* Pomerantz Res. 4 ("The District Attorney . . . instructed Mr. Pomerantz, in writing, to provide no information to the [Committee] in response to the subpoena.); *see also* Pomerantz Dec. ¶ 6 ("[I]f I were to testify, I believe that the District Attorney would instruct me to assert the various claims of privilege he has identified in his moving papers."). This claimed deference to the District Attorney's command is a surprising about-face, particularly given that Pomerantz previously *declined* the District Attorney's request to review his book manuscript before publication. *See* Compl. ¶ 90.

Mem. 23. The Court cannot decide, before-the-fact, "what information or answers [Pomerantz] may validly be required to give or the validity of any objections he might make." *Sanders v. McClellan*, 463 F.2d 894, 903 (D.C. Cir. 1972); *see also Ansara v. Eastland*, 442 F.2d 751, 753 (D.C. Cir. 1971) (noting that "courts [should] avoid use of extraordinary remedies that involve 'needless friction' with a coordinate branch of the government" where "the plaintiffs [sought] relief that would precede and seek to relate to the conduct of a *future* legislative hearing" (emphasis added) (citation omitted)). But in the event that this situation does arise, Pomerantz has avenues for judicial review. *See, e.g.*, *Watkins*, 354 U.S. at 214–16; *United States v. House of Representatives of U.S.*, 556 F. Supp. 150, 152 (D.D.C. 1983) ("[C]onstitutional claims and other objections to congressional investigatory procedures may be raised as defenses in a criminal prosecution.").

Pomerantz complains that he is in a "legally untenable position" because he will be forced to make a choice between "legal or ethical consequences" or "potential criminal and disciplinary exposure." Pomerantz Res. 4–5. The Court, again, is unable to surmise whether Pomerantz will *actually* face such a dilemma. In addition, the Court notes that Pomerantz is in this situation because *he* decided to inject himself into the public debate by authoring a book that he has described as "appropriate and in the public interest." *Inside Account* at 280.

Finally, Bragg cannot seriously claim that any information *already published* in Pomerantz's book and discussed on prime-time television in front of millions of people is protected from disclosure as attorney work product (or otherwise). *See* Pl. Mem. 21–22. On the record at the hearing on the motion for emergency relief, Bragg's counsel admitted that Pomerantz's book did not preserve the confidences of the District Attorney's Office. While Bragg maintains that Pomerantz's inappropriate disclosures cannot waive DANY's privilege, such a claim is belied by DANY's inaction in response to Pomerantz's *known plan* to publish a book about DANY's

investigation into President Trump. If that information *ever* was protected from disclosure as attorney work product,[15] the protection has been *waived* by DANY. Bragg concedes that he was aware of Pomerantz's intention to publish the book *before* it was published. Compl. ¶ 90. Although Bragg contends that he "diligently sought to protect [the privilege]," he merely "remind[ed] Mr. Pomerantz of his obligations not to disclose confidential or privileged information and request[ed] the opportunity for prepublication review." Pl. Mem. 21. By Bragg's own admission, Pomerantz *declined* the request for pre-publication review and proceeded to publish the book anyway. Pl. Mem. 21–22. There is no evidence that DANY took *any action* before the book was published—such as seeking to enjoin publication or distribution.[16] Similarly, after publication, DANY *again* took no action. It did not request a gag order, seek an injunction, pursue Pomerantz for money damages, refer Pomerantz for an ethics inquiry, or even raise any concerns about the publication with Pomerantz. This repeated inaction constitutes acquiescence to the disclosure of any otherwise privileged information. *See, e.g.*, *Cruz v. Coach Stores, Inc.*, 196 F.R.D. 228, 230 (S.D.N.Y. 2000) (privilege waived where "Coach raised no objection when . . . Jaspan Associates . . . publicly filed a copy of the [purportedly privileged document and Coach] . . . neither sought its sealing by the Court nor raised any objection with Jaspan Associates."); *von Bulow by Auersperg v. von Bulow*, 114 F.R.D. 71, 76 (S.D.N.Y. 1987) ("An attorney's disclosure of communications with his client will constitute a waiver of the attorney-client privilege if the

---

[15] Pomerantz seemingly contends it was not, as he has publicly stated that he is "confident that all of [his] actions with respect to the Trump investigation, including the writing of [his] forthcoming book, are consistent with [his] legal and ethical obligations." Compl. ¶ 90; *see also Inside Account* at 279–80 ("The public debate about Trump's conduct, his unique public status, the circumstances under which my work ended, and the extensive news coverage about the progress of the investigation convinced me that writing this book was appropriate and in the public interest.").

[16] At the hearing on the motion for emergency relief, the Court repeatedly pressed Bragg to describe what, if any steps, DANY took to preserve its privilege after it became aware that Pomerantz intended to publish a book. In response to that questioning, Bragg's counsel represented for the first time that at some point, she copied the City's Department of Investigation on an email containing the letter that DANY sent to Pomerantz reminding him of his ethical obligations to DANY.

client has . . . acquiesced in the disclosure."). Because Bragg has *never* claimed that any information in the book was privileged, he may not do so now simply because it is convenient.

In sum, the Court is unwilling to hypothesize about, and prophylactically rule on, the permissibility of questions that may—or may not—arise at the deposition of Pomerantz. Bragg has not shown a likelihood of success on the merits. The Court therefore need not address the other prongs of the temporary restraining order analysis. *See Oneida*, 645 F.3d at 164.[17]

## **CONCLUSION**

For the foregoing reasons, the motion for a temporary restraining order enjoining the subpoena to depose Mr. Pomerantz and enjoining Mr. Pomerantz from appearing is DENIED.

In our federalist system, elected state and federal actors sometimes engage in political dogfights. Bragg complains of political interference in the local DANY case, but Bragg does not operate outside of the political arena. Bragg is presumptively acting in good faith. That said, he is an elected prosecutor in New York County with constituents, some of whom wish to see Bragg wield the force of law against the former President and a current candidate for the Republican presidential nomination. Jordan, in turn, has initiated a political response to what he and some of his constituents view as a manifest abuse of power and nakedly political prosecution, funded (in part) with federal money, that has the potential to interfere with the exercise of presidential duties and with an upcoming federal election. The Court does not endorse either side's agenda. The sole question before the Court at this time is whether Bragg has a legal basis to quash a congressional subpoena that was issued with a valid legislative purpose. He does not.

---

[17] In his Complaint, Bragg seeks a declaratory judgment that any *future* subpoenas served by Jordan or the Committee on Bragg or "any of his current or former employees or officials" are "invalid, unconstitutional, *ultra vires*, and/or unenforceable" and a "permanent and preliminary injunction enjoining enforcement of any such [future] subpoena." Compl. ¶ 127; *see* Compl. ¶ 20. To be clear, Bragg seeks this declaratory judgment for theoretical *future* subpoenas which Jordan or the Committee may issue against him or others. On the record at the hearing on the motion for emergency relief, Bragg's counsel represented that he is not seeking such a declaratory judgment at this time.

The parties are encouraged to speak with one another to reach a mutually agreeable compromise regarding how the deposition of Mr. Pomerantz will proceed. This Court will retain jurisdiction over this dispute and any ancillary claims arising out of the inquiry by the Committee relating to the use of federal funds in a manner that may influence the 2024 presidential election. In other words, Bragg may not file successive proceedings under a different index number if and when the Committee in fact issues another subpoena that he finds objectionable or if there are issues with respect to the Pomerantz deposition. The parties are HEREBY ORDERED to file a joint status report within 30 days of the date of this Order.

**SO ORDERED.**

**Date:** **April 19, 2023**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**