# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

ALVIN L. BRAGG JR., in his official
capacity as District Attorney for New
York County,

*Plaintiff-Appellant*,

v.

MARK F. POMERANTZ,

*Defendant-Appellant*,

v.

JIM JORDAN, in his official capacity as
the Chairman of the Committee on the
Judiciary, and the COMMITTEE ON
THE JUDICIARY OF THE UNITED
STATES HOUSE OF
REPRESENTATIVES,

*Defendants-Appellees*.

No. 23-615
No. 23-616

## CONGRESSIONAL DEFENDANTS-APPELLEES' OPPOSITION TO APPELLANT'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY APPLICATION FOR AN ADMINISTRATIVE STAY AND STAY OF RETURN DATE PENDING EXPEDITED APPEAL

Matthew Berry
  *General Counsel*
Todd B. Tatelman
  *Deputy General Counsel*
Brooks M. Hanner
Sarah Clouse
Bradley Craigmyle
  *Associate General Counsels*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC 20515
(202) 225-9700

*Counsel for Congressional Defendants-Appellees*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................5

BACKGROUND...................................................................................6

PROCEDURAL HISTORY ...................................................................11

ARGUMENT ......................................................................................14

   I.  Appellant Has Not Made A Strong Showing That He Is Likely To Succeed On The Merits.................................................................................15

      A.  The Speech Or Debate Clause Bars Appellant's Attempt To Block A Duly Issued Congressional Subpoena.........................................15

      B.  The Committee's Issuance Of The Pomerantz Subpoena Is A Legislative Act.................................................................................18

      C.  The Committee's Subpoena To Pomerantz Is Absolutely Protected By The Clause .........................................................................19

      D.  Appellant's Arguments Against The Subpoena Lack Merit...........25
          1.  *Mazars* Is Not The Appropriate Framework...........................25
          2.  The Subpoena Serves A Valid Legislative Purpose.................27

  II.  Appellant Has Failed To Establish A Likelihood Of Irreparable Harm ...........32

      A.  The  Deposition Of Pomerantz, A Former Employee, Would Not Interfere With Any Criminal Proceedings .......................................32

      B.  The Deposition Would Not Cause Any Confidentiality- or Privilege-Related Harm To The Office .............................................34

      C.  The Deposition Would Not Inflict Any Harm On The Office's "Dignitary Interests".................................................................40

 III.  The Balance Of Equities And Public Interest Favor Congressional Appellees.................................................................................41

CONCLUSION ...................................................................................45

CERTIFICATE OF COMPLIANCE........................................................47

CERTIFICATE OF SERVICE.................................................................................48

# INTRODUCTION

Numerous Supreme Court decisions have affirmed Congress's immunity from suit under the U.S. Constitution's Speech or Debate Clause. Appellant, District Attorney Alvin Bragg, Jr., has sued a Congressional Committee and its Chairman and now asks this Court to issue an injunction pending appeal, mentioning this immunity in only a single footnote.[1] That injunction would impede a Congressional inquiry by delaying a deposition subpoena duly issued by the Committee on the Judiciary of the United States House of Representatives (Committee), to Defendant-Appellant Mark Pomerantz, a former Special Assistant District Attorney in the New York County District Attorney's Office (Office), who has written a book and given numerous television interviews about his work in that Office investigating former President Donald Trump. However, when the Committee sought to question Pomerantz about the same subject, Appellant filed a lawsuit against the Committee and its Chairman Jim Jordan (Congressional Appellees) and a motion for immediate injunctive relief. The district court denied that motion in a comprehensive 25-page opinion. Among other things, it found that the Committee's subpoena serves more than one valid legislative purpose.

---

[1] Although Appellant styles his emergency application as one for a "stay of the return date" of the subpoena, and despite his request to "stay … the subpoena," App.'s Mem. at 53 ("App.'s Mem." refers to Appellant's emergency application), in reality, Appellant is asking for an *injunction* that would prevent enforcement of the subpoena. As we explain below, that means he must make an even higher showing than if he were simply requesting a stay of a district court order.

Appellant is now asking this Court to issue an injunction, which is an extraordinary remedy, *Nken v. Holder*, 556 U.S. 418, 428 (2009), in the first instance. To obtain relief, Appellant must make more than even a strong showing that he is likely to succeed on the merits, *Agudath Israel of Am. v. Cuomo*, 979 F.3d 177, 180 (2d Cir. 2020). He has not. Appellant is far from the first person who has tried to block a Congressional subpoena, and courts have consistently rejected those attempts.[2] By contrast, Appellant does not cite a single case where a similar effort has ultimately been successful. He falls well short of making the necessary showing regarding success on the merits, and this Court should deny the motion on that basis alone. Moreover, Appellant fails to meet his burden with respect to irreparable harm, and the balance of equities weighs in favor of Congressional Appellees.

## BACKGROUND

The Office has been investigating former President Donald Trump for years. ECF 1 at ¶ 28.[3] In February 2021, Pomerantz was hired as a Special Assistant District Attorney by Appellant's predecessor, Cyrus Vance, Jr., to assist with the Office's investigation of the former President. During his 2021 campaign to replace Vance,

---

[2] *See, e.g.*, *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 512 (1975); *Budowich v. Pelosi*, 610 F. Supp. 3d 1, 12 (D.D.C. 2022); *Meadows v. Pelosi*, 2022 WL 16571232, at *1 (D.D.C. Oct. 31, 2022); *Ward v. Thompson*, 2022 WL 4386788, at *11 (D. Ariz. Sept. 22, 2022); *Eastman v. Thompson*, 594 F. Supp. 3d 1156, 1174, 1199 (C.D. Cal. 2022); *Friess v. Thompson*, 2022 WL 14813721, at *1 (D. Colo. Oct. 26, 2022), *R. & R. adopted*, 2022 WL 17039241 (D. Colo. Nov. 17, 2022).

[3] "ECF" refers to the relevant docket entry in the district court proceeding.

Appellant made the former President a central issue. For example, Appellant was asked in a media interview: "I know a lot of people are wondering, whoever has this job, are they going to convict Donald Trump?" ECF 32-1 (00:46 to 00:55). He responded: "Look that is the number one issue we know [Vance] is investigating. … I'm the candidate in the race who has the experience with Donald Trump." *Id.* (00:55 to 01:16). As a candidate, Appellant said, "[i]t is a fact that I have sued [the former President] more than a hundred times." ECF 32-2 at 6.

Appellant became District Attorney on January 1, 2022, and Pomerantz resigned from the Office less than three months later. His publicly available resignation letter noted he did so because he was frustrated by Appellant's failure to prosecute the former President. ECF 32-3. His public resignation reportedly left Appellant "deeply stung," and caused him to issue an "unusual" public statement "emphasizing that the investigation into [the former President] and his business was far from over." ECF 32-4 at 2.

Pomerantz later wrote a book that gave the public a firsthand account of the Office's inner workings. *See* Mark Pomerantz, *People vs. Donald Trump: An Inside Account* (2023). In his words, he told the public "all about" his work investigating the former President, and "described the inner dialogue of the investigation." *Id.* at 2, 279. For example, he recounted internal conversations between attorneys working on the investigation, summarized internal discussions with witnesses, and discussed the attorneys' mental impressions about the strength or weakness of potential

prosecutorial theories. *See, e.g., id.* at 11-13, 16, 41, 50-56, 58, 171-78. On the other hand, Pomerantz indicated that he would not discuss what happened in front of the grand jury or in sealed litigation. *Id.* at 277.

Appellant took no legal action to prevent Pomerantz from disclosing the information in the book. He never sued to block the book's publication, and it was released in early February 2023. Pomerantz then gave a flurry of media interviews about his work on the investigation of the former President. He appeared, for instance, on CBS's 60 Minutes, ABC's Good Morning America, MSNBC's The Rachel Maddow Show, and CNN This Morning. ECF 32-5 to 32-15. Similarly, Appellant took no legal action to stop these interviews, to prevent Pomerantz from discussing any information, or to seek any redress from or discipline of him for disclosing the information. The Office sent a single letter to Pomerantz, claiming that he was required to obtain permission before making certain disclosures and asking for a chance to review the book. *See* ECF 44 at 23.[4] Pomerantz publicly responded that he was "confident that all of [his] actions with respect to the Trump investigation, including the writing of [his] forthcoming book, [were] consistent with [his] legal and ethical obligations." ECF 1 at ¶ 90 (citation omitted).

_____

[4] During the hearing in the district court, Appellant's "counsel represented for the first time that at some point, she copied the City's Department of Investigation on an email containing the letter that DANY sent to Pomerantz reminding him of his ethical obligations to [the Office]." ECF 44 at 23 n.16.

Meanwhile, in November 2022, shortly after the former President declared his presidential candidacy, it was publicly reported that the Office was "jump-start[ing]" a criminal investigation into the former President involving alleged hush money "that once seemed to have reached a dead end." ECF 32-16 at 2. On March 9, 2023, it was reported that the Office had invited the former President to testify before a grand jury, a move that suggested he could soon be indicted. ECF 32-17. It was reported the Office would seek to pursue "unusual" charges against the former President by bootstrapping unnamed (and uncharged) federal crimes onto otherwise misdemeanor conduct, and thus extend the statute of limitations. ECF 32-4 at 3. Given Appellant's campaign rhetoric, the timing of the investigation's resurrection, Vance's prior decision not to proceed with such charges, and the unusual nature of the reported charges, this news gave rise to widespread speculation that an impending indictment could be politically motivated. ECF 32-18 to 32-19.

The Committee began an investigation soon after, concluding that the prospect of a politically motivated prosecution of a former President could give rise to issues of substantial federal concern. This is because a former President is unlike any other former federal official or employee, and Congress has long recognized that "[t]he interest of the American people in the President does not cease when his term of office has ended." H. Rep. No. 85-2200, at 3 (1958). Federal law reflects this unique interest; former Presidents are entitled to protective services and a host of special benefits. Furthermore, the prospect of "politically motivated prosecutions of

Presidents of the United States (former or current) for personal acts … could have a profound impact on how Presidents choose to exercise their powers while in office. For example, a President could choose to avoid taking action he believes to be in the national interest because it would negatively impact New York City for fear that he would be subject to a retaliatory prosecution in New York City." ECF 12-12 at 2-3.

On March 20, 2023, three House Committee Chairmen sent Appellant a letter asking him to provide, among other things, information relating to his Office's receipt and use of federal funds. ECF 12-2 at 4. Unfortunately, Appellant has generally been uncooperative with the Committee's investigation. For example, it has been reported that when a Committee staff member called the Office and identified himself, the person answering the phone hung up. ECF 32-20 at 2. The Committee staffer called back and was told: "Your committee has no jurisdiction over us. You're wrong. Stop calling us with this bullshit." *Id.* The person hung up again. In responding to the March 20 letter, the Office largely refused to comply with the Committee's request. ECF 12-11 at 2-5. It did, however, offer to describe how the Office uses federal funds. *Id.* at 5.

The Committee sent a second letter to Appellant that explained its investigation in more detail and again requested voluntary compliance. ECF 12-12. Days later, the fact that the former President had been indicted was made public. ECF 1 at ¶ 68. The next day, the Office responded to the Committee's second letter and again largely refused to voluntarily comply with the investigation. ECF 12-20 at

2-4. However, the Office did inform the Committee that it had spent federal funds, in the form of federal forfeiture money, in its investigation of the former President. *Id.* at 5.

As part of its investigation, the Committee also sent a letter to Pomerantz. ECF 12-61. Though the Committee requested his voluntary cooperation, he declined because the Office "ha[d] instructed [him] to not provide any information or materials in response to [the Committee's] request." ECF 12-13 at 2. Subsequently, the Committee subpoenaed Pomerantz compelling his appearance for a deposition on April 20. ECF 12-1 at 7. The Committee informed Pomerantz that because of his "unique role as a special assistant district attorney leading the investigation into President Trump's finances, [he is] uniquely situated to provide information that is relevant and necessary to inform the Committee's oversight and potential legislative reforms." *Id.* at 3.

## PROCEDURAL HISTORY

Five days after the Committee subpoenaed Pomerantz, Appellant sued Chairman Jordan, the Committee, and Pomerantz. ECF 1. He requested a temporary restraining order and preliminary injunction barring enforcement of, or compliance with, the subpoena. ECF 7. The district court "decline[d] to enter the proposed Temporary Restraining Order and Order to Show Cause," ordered Defendants to respond by April 17, and scheduled a hearing for April 19. ECF 13 at 1-2.

Pomerantz filed a pleading on April 17 where he referred to himself as a "nominal[]" defendant, and he "join[ed] in the District Attorney's motion for interim relief." ECF 30 at 1, 7. Pomerantz made clear that his interests are aligned with Appellant's. *See id.* at 1 ("object[ing] to the subpoena" and "ask[ing] [the district court] to grant the District Attorney's motion").

The district court held the hearing as scheduled and, later the same day, denied Appellant's motion because he "ha[d] not demonstrated a likelihood of success on the merits." ECF 44 at 10. It emphasized that, despite the extraneous material included in Appellant's filing,[5] "[t]he sole question before the Court at this time is whether [Appellant] has a legal basis to quash a congressional subpoena that was issued with a valid legislative purpose." *Id.* at 24; *see also id.* at 5 ("The reality is that, as framed, this action is merely a motion to quash a subpoena dressed up as a lawsuit.").

The district court found that "[t]he subpoena was issued with a 'valid legislative purpose' in connection with the 'broad' and 'indispensable' congressional power to 'conduct investigations.'" *Id.* at 1. It noted that "[t]here can be no doubt that Congress may permissibly investigate the use of federal funds, particularly where the result of the investigation might prompt Congress to pass legislation changing how such funds are appropriated or may be spent." *Id.* at 12. Indeed, Appellant's counsel

---

[5] *See id.* at 5 ("The first 35 pages of the Complaint have little to do with the subpoena at issue and are nothing short of a public relations tirade against former President and current presidential candidate Donald Trump. The same is true of the vast majority of the exhibits accompanying the Boutrous Declaration.").

conceded at the hearing that this "is a valid legislative purpose." *Id.* The district court also credited Congressional Appellees' second legislative purpose, "the possibility of legislative reforms to insulate current and former presidents from state prosecutions, such as by removing criminal actions filed against them from state to federal court," noting that "Congress, of course, has authority to consider, and to investigate, this potential legislative reform." *Id.*

The district court rejected Appellant's argument that a heightened standard of review should apply to this subpoena because of the Supreme Court's decision in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) (and decided that the subpoena would satisfy the heightened standard anyway). *Id.* at 14-18. It added that the "distinct possibility of immunity weighs against concluding that Bragg has shown a likelihood of success on the merits." *Id.* at 18.

The district court then considered Appellant's claim that the subpoena should be quashed because Pomerantz's deposition would raise privilege concerns and found his "throw-everything-at-the-wall approach … unpersuasive." *Id.* at 19. Beyond that, the court concluded that Appellant "cannot seriously claim that any information *already published* in Pomerantz's book and discussed on prime-time television in front of millions of people is protected from disclosure as attorney work product (or otherwise)"; the court elaborated: because Appellant "has *never* claimed that any information in the book was privileged, he may not do so now simply because it is convenient." *Id.* at 22, 24.

The district court ultimately concluded that "the deposition should proceed in the normal course, question by question, and Pomerantz is free to object, personally or through his counsel, and decline to answer any questions when (and if) appropriate." *Id.* at 21. Because Appellant had not shown a likelihood of success on the merits, the district court did not address the other prongs of the temporary injunction analysis. *Id.* at 24.

Appellant filed an "emergency application for an administrative stay and stay of return date pending expedited appeal." This Court granted an administrative stay the same day, ordered Appellees to respond by April 21, 2023, at 3:00 p.m., and added the motion to the substantive motions calendar for April 25.

## ARGUMENT

The Supreme Court has explained that "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (citation omitted). To get such "an extraordinary remedy," the moving party must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008).

In the context of an emergency motion like this, an even stronger showing is required. For example, this Court has said that "more is required" when a party wants to stay a district court's order pending appeal. *Cuomo*, 979 F.3d at 180 ("To obtain a stay of a district court's order pending appeal, more is required, including a 'strong

showing that [the movant] is likely to succeed on the merits.'" (alteration in original) (citation omitted)).

Appellant's burden here is even higher because he "seek[s] a remedy still more drastic than a stay: an injunction issued in the first instance by an appellate court." *Id.* Thus, his "request demands a *significantly higher justification* than a request for a stay because, unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Id.* (emphasis added) (citation omitted).

Finally, because the district court's underlying "order involve[es] injunctive relief," it "is subject to reversal only for an abuse of discretion or for a clear error of law." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999).

I.   **Appellant Has Not Made A Strong Showing That He Is Likely To Succeed On The Merits**

   A.   **The Speech Or Debate Clause Bars Appellant's Attempt To Block A Duly Issued Congressional Subpoena**

The district court reasoned that the "distinct possibility of [Speech or Debate Clause] immunity *weighs against concluding* that [Appellant] has shown a likelihood of success on the merits." ECF 44 at 18 (emphasis added). Appellant's application, like his initial filing below, fails to adequately confront this core constitutional immunity, only addressing the Speech or Debate Clause in a single footnote of his 53-page filing. Ignoring decades of Supreme Court precedent holding that the Clause protects Members and Committees from suit for their legislative actions, including the issuance

of subpoenas, Appellant offers *only* one argument in his application for why the Clause does not apply in this case: "Because the subpoena lacks any valid legislative purpose, the congressional defendants are not entitled to Speech or Debate immunity." App.'s Mem. at 30 n.6. Appellant is wrong, and his statement ignores the express directives of the Supreme Court.

The Speech or Debate Clause mandates that Senators and Representatives "shall not be questioned in any other Place" for "any Speech or Debate in either House." U.S. Const., Art. I, § 6, cl. 1. By "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct," *Gravel v. United States*, 408 U.S. 606, 618 (1972), the Clause both "preserve[s] the independence and ... integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 524 (1972), and "reinforc[es] the separation of powers," *Eastland*, 421 U.S. at 502.

The absolute immunity afforded by the Speech or Debate Clause extends to *all* civil actions. *See id.* at 503. The Clause protects federal legislators "not only from the consequences of litigation's results but also from the burden of defending themselves." *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967). The D.C. Circuit, for example, has specifically held that "[t]he Speech or Debate Clause operates as a jurisdictional bar" when a suit is predicated on legislative actions. *Howard v. Off. of the Chief Admin. Officer*, 720 F.3d 939, 941 (D.C. Cir. 2013) (quotation marks omitted).

"The purpose of the [Speech or Debate] Clause is to insure that the legislative function the Constitution allocates to Congress may be performed *independently*. …

[T]he central role of the Clause is to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Eastland*, 421 U.S. at 502 (emphasis added and internal quotation marks omitted). Indeed, the Supreme Court "has reiterated the central importance of the Clause for preventing intrusion by [the] Executive and Judiciary into the legislative sphere." *United States v. Helstoski*, 442 U.S. 477, 491 (1979). Because "the guarantees of the Clause are vitally important to our system of government," they "are entitled to be treated by the courts with the sensitivity that such important values require." *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979). Accordingly, the Supreme Court has repeatedly, and "[w]ithout exception, … read the Speech or Debate Clause broadly to effectuate its purposes." *Eastland*, 421 U.S. at 501.[6]

The Court in *Eastland* emphasized that Speech or Debate Clause immunity is "absolute" and covers all actions "within the sphere of legitimate legislative activity." 421 U.S. at 501 (quotation marks omitted). Thus, so long as the Committee's subpoena to Pomerantz is "within the sphere of legitimate legislative activity," *Eastland*, 421 U.S. at 501, it cannot be the subject of litigation against the Committee or its Chairman.

---

[6] *See also Doe v. McMillan*, 412 U.S. 306, 311 (1973); *Gravel*, 408 U.S. at 617-18; *United States v. Johnson*, 383 U.S. 169, 179 (1966); *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880).

**B. The Committee's Issuance Of The Pomerantz Subpoena Is A Legislative Act**

Legislative activity includes much more than words spoken in debate. The "cases have plainly not taken a literalistic approach in applying the privilege. … Committee reports, resolutions, and the act of voting are equally covered[.]" *Gravel*, 408 U.S. at 617. The Supreme Court has instructed that, to determine whether the challenged act is "legislative," and thus entitled to Speech or Debate Clause immunity, courts must assess the "nature of the act." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).

This case deals with a subpoena, and the Supreme Court has unambiguously held that the "power to investigate and to do so through compulsory process" is activity within the legislative sphere. *Eastland*, 421 U.S. at 504. This is because "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Id.* (internal quotation marks omitted).

Issuing a subpoena has long been held to be a legitimate use by Congress of its power to investigate. *Eastland*, 421 U.S. at 504. "It also has been held that the subpoena power may be exercised by a committee acting … on behalf of one of the Houses." *Id.* at 505. As a result, a committee's "issuance of a subpoena pursuant to an authorized investigation is … an indispensable ingredient of lawmaking," *id.*, and the Speech or Debate Clause precludes litigation challenges to such subpoenas, *see id.* at 507.

Courts have consistently held that once the legislative-act test is satisfied, as it so clearly was below, that is "the end of the matter." *See, e.g., MINPECO, S.A. v. Conticommodity Servs., Inc.*, 844 F.2d 856, 861 (D.C. Cir. 1988); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418-19 (D.C. Cir. 1995) ("Once the legislative-act test is met, … the privilege is absolute." (citation omitted)).

The Clause also bars any "inquiry … into … the motivation for [legislative] acts." *Brewster*, 408 U.S. at 512; *see also Johnson*, 383 U.S. at 180, 184-85 (a charge that legislative "conduct was improperly motivated … is precisely what the Speech or Debate Clause generally forecloses from executive and judicial inquiry"). Allegations that a Legislative Branch official acted unlawfully or with an unworthy purpose do not abrogate the protections afforded by the Clause. *See, e.g., McMillan*, 412 U.S. at 312-13 (Clause applies to all legislative activities "even though [the] conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes"); *see also Eastland*, 421 U.S. 491 (rejecting argument that because congressional subpoena violated First Amendment it could not be protected by the Speech or Debate Clause).

### C. The Committee's Subpoena To Pomerantz Is Absolutely Protected By The Clause

Appellant's request for an injunction, and his entire case, is squarely foreclosed by binding Supreme Court precedent, specifically *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975). In *Eastland*, a Senate Committee was investigating various activities

of the United States' Serviceman's Fund, Inc. (USSF) to determine whether they were potentially harmful to the morale of the U.S. Armed Forces. *See id.* at 493. USSF sued the Chairman, Members, and Chief Counsel of the Committee to enjoin a subpoena issued to USSF's bank for account records. *See id.* at 494-95. The Supreme Court rejected the notion that the subpoena could be judicially quashed because "the Speech or Debate Clause provides complete immunity for the Members for issuance of this subpoena." *Id.* at 507.

The Court in *Eastland* confirmed the limited role of the Judiciary in deciding whether a Congressional committee's issuance of a subpoena involves legislative matters protected by the Speech or Debate Clause. *Id.* at 506 ("The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province." (citation omitted)). Indeed, the sole issue for a reviewing court is a deferential assessment of whether "the investigation upon which the [committee] had embarked concerned a subject on which 'legislation could be had.'" *Id.* (citation omitted). The delay and distraction to the legislative inquiry in *Eastland* "illustrates vividly the harm that judicial interference may cause." *Id.* at 511. The Speech or Debate Clause "was written to prevent the need to be confronted by such 'questioning' and to forbid invocation of judicial power to challenge the wisdom of Congress' use of its investigative authority." *Id.*

Here, there is no doubt that the subpoena to Pomerantz was issued in furtherance of the Committee's investigation concerning "a subject on which

'legislation could be had.'" *Id.* at 506 (citation omitted). Appellant's actions

necessarily implicate important federal legislative interests. For starters, the record

indicates that the Office has spent federal forfeiture money on its investigation of the

former President. *See* App.'s Mem. at 6, 8; ECF 12-20 at 3-4. Therefore, Congress,

which holds the power of the purse, may examine whether it is appropriate for federal

monies to be used in such investigations. If state or local law enforcement

investigations of former or current Presidents are being conducted for political

reasons, it could be a wise policy to prohibit the disbursement of federal funds for the

investigations of such individuals. Indeed, the Committee is considering legislation

that would prohibit the use of federal forfeiture funds to investigate current or former

Presidents or Vice Presidents. H.R. 2582, 118th Cong. (2023).[7] Moreover, at the

hearing on the motion for emergency relief below, "Bragg's counsel conceded that the

investigation of DANY's use of federal funds is a valid legislative purpose." ECF 44

at 12. As the district court recognized, "[t]his purpose, standing alone, is clearly

sufficient to justify the subpoena and thereby end this … inquiry." *Id.*

The federal government also has a substantial interest in the welfare of former

Presidents. Under federal law, former Presidents are entitled to funding for an office

staff, "suitable office space, appropriately furnished and equipped," a substantial

lifetime federal pension, travel funds, and franked mail privileges. *See* 3 U.S.C. § 102

---

[7] Available at https://www.congress.gov/bill/118th-congress/house-bill/2582/text?s=1&r=1.

note (a), (c), (g); 39 U.S.C. § 3214.  They also have Secret Service protection.

18 U.S.C. § 3056(a)(3).  Congress may therefore examine whether former Presidents

are being subject to politically motivated state investigations and prosecutions due to

the policies they advanced as President, and, if so, what legislative remedies may be

appropriate.  For example, the Committee is considering legislation that would

expressly allow current and former Presidents and Vice Presidents to remove any

criminal actions against them from state to federal court.[8]  Such legislation could help

protect current and former Presidents from potentially politically motivated

prosecutions by having all such matters heard in federal courts, pursuant to uniform

federal rules of procedure, and overseen by life-tenured federal judges.  Moreover,

Congress is actively investigating and considering the effects that Appellant's actions,

and actions similar to it, are having and may continue to have on all of the benefits

and federal expenses applicable to former Presidents to determine what, if any,

legislative reforms are needed.

In any event, to effectively propose legislation for Congressional consideration,

the Committee must gather information so that it can make informed decisions about

the need for legislative action and the precise content of such proposed legislation.

This power of inquiry is protected regardless of whether legislation actually results.

---

[8] Available at https://www.congress.gov/bill/118th-congress/house-bill/2553/text?s=1&r=1.

*Eastland*, 421 U.S. at 509 ("Nor is the legitimacy of a congressional inquiry to be defined by what it produces.").

Appellants argue that Pomerantz has no knowledge about the Committee's purported legislative purposes, and thus there can be "no plausible connection" between Pomerantz and what the Committee wants to know. App.'s Mem. at 41-43. However, given Pomerantz's intimate familiarity with the inner workings of the Office and its investigation of a former President, he may be able to provide information that illuminates whether any political motivations were present, and whether federal interests may (or may not) have factored into the Office's decision-making process. This information may provide the Committee with insights regarding whether new restrictions on the use of federal funds are appropriate and whether Congress should take legislative steps to help protect former Presidents from politically motivated prosecutions. In short, Pomerantz has information relevant to whether a problem is emerging that justifies legislative reforms.

Even if Pomerantz's answers are ultimately unhelpful to the Committee, the Supreme Court has made clear that "[t]he wisdom of the congressional approach or methodology is not open to judicial veto" and has recognized that Congressional investigations may lead "up some 'blind alleys' and into nonproductive enterprises. To be a valid legislative inquiry there need be no predictable end result." *Eastland*, 421 U.S. at 509.

Additionally, Appellant's attempt to impugn the Committee's motives with his numerous references to social media posts and other public statements by current and former elected officials fails. *See generally*, ECF 1, 8, 12. This exact strategy has been rejected in other contexts. Specifically, in *Comm. On Ways & Means v. U.S. Dep't of Treasury*, the D.C. Circuit held that the Speech or Debate Clause precluded the use of public statements of individual Members and the Speaker, interview statements, and social media posts to demonstrate that the rationale for a Congressional request for information was a "mere pretext for an unconstitutional ulterior motive." 45 F.4th 324, 330-32 (D.C. Cir. 2022). Relying on the Supreme Court's binding instruction that "in determining the legitimacy of a congressional act we do not look to the motives alleged to have prompted it," *id.* (citing *Eastland*, 421 U.S. at 508), the court explained that motives of the Committee Members "would not vitiate an investigation which had been instituted by a House of Congress if that assembly's legislative purpose is being served," *id.* (citing *Watkins*, 354 U.S. at 200).

Here, because a valid legislative purpose has already been conceded and Congressional Appellees can conclusively establish that the issuance of the subpoena was a legitimate legislative act related to a subject on which legislation could be had, that is the end of the judicial inquiry. *See Eastland*, 421 U.S. at 506. Accordingly, the Speech or Debate Clause immunity applies, Appellant cannot demonstrate any likelihood of success on the merits, and his emergency application must be denied.

### D. Appellant's Arguments Against The Subpoena Lack Merit

#### 1. *Mazars* Is Not The Appropriate Framework

Appellant characterizes this case as one involving the structural separation of powers and therefore argues that the Supreme Court's framework in *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020), applies. *See* App.'s Mem. at 45. Appellant's reliance on *Mazars* is misplaced.

*First*, none of the Committees in *Mazars* asserted Speech or Debate Clause immunity, and the Supreme Court's opinion does not refer to the Clause. Thus, the reasoning of *Mazars* does not bear on whether a particular subpoena is legislative in nature or falls within the legitimate legislative sphere. In fact, other district courts have expressly held that *Mazars* "has no bearing" on the question of whether Congressional activity is protected by the Speech or Debate Clause. *See, e.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Schiff*, 518 F. Supp. 3d 505, 519 (D.D.C. 2021); *Meadows v. Pelosi*, 2022 WL 16571232 (D.D.C. Oct. 31, 2022). The D.C. District Court's decision in *Meadows* is particularly instructive. There, the former White House Chief of Staff sought to enjoin a Congressional subpoena by directly suing the issuing committee. Although Speech or Debate Clause immunity was not asserted, the district court applied it *sua sponte*, and did so notwithstanding that the litigation raised significant Legislative Branch-Executive Branch conflicts. Recognizing that the framework of *Mazars* "does not upset" the existing scheme for considering Speech or Debate Clause immunity, 2022 WL 16571232, at *12, the district court concluded that

courts only need to "engage in this kind of balancing [of interbranch conflicting interests] when Speech or Debate Clause immunity is *inapplicable*." *Id.* Or, put another way, the "Speech or Debate Clause immunity under *Eastland* [does not] weaken[] when a suit against congressional defendants implicates conflicting interests of coordinate branches." *Id.*

*Second*, even leaving aside the Speech or Debate Clause, *Mazars* addressed only "significant separation of powers issues raised by congressional subpoenas for the President's information." 140 S. Ct. at 2033. No such issues are present here. In developing the test ultimately applied to the subpoenas at issue in *Mazars*, the Court relied heavily on the "unique constitutional position" of the President. *Id.* at 2035-36. As the Court explained, the "President is the only person who alone composes a branch of government." *Id.* at 2033. This dynamic is a wholly singular one where the "'[t]he interest of the man' is often 'connected with the constitutional rights of the place.'" *Id.* (citing The Federalist No. 51, at 349). Moreover, the Court reasoned that "the President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation." *Id.* at 237. Indeed, given the reasoning set forth in the Supreme Court's opinion, it seems unlikely that the *Mazars* framework would even apply to the Vice President or a Cabinet Secretary.

Moreover, *Mazars* was premised on a dispute between the two political branches of the federal government established by the Constitution. The subpoena at issue here was issued to a former employee of a local government agency, the Office.

Moreover, the district court correctly observed that Pomerantz is "a private citizen who is no longer employed by any state government and who has written a book and spoken extensively about the subject matter of the congressional inquiry." ECF 44 at 14. In any event, neither the federalism nor intrusion into state sovereignty arguments advanced by Appellant are applicable for the reasons explained below so their argument for utilizing the *Mazars* framework fails on its own terms.

Even if the *Mazars* framework did apply, as the district court explained, it would be satisfied here. ECF 44 at 14-18.

### 2.     The Subpoena Serves A Valid Legislative Purpose

Appellant asserts that the Committee's subpoena is invalid because it lacks any "valid legislative purpose." *Id.* at 31. Quite the opposite is true. As the Supreme Court has made clear, this Court's examination should be limited to whether the Committee's inquiry is authorized under House Rules (which it is), and whether Appellant can demonstrate that the subpoena is "plainly incompetent or irrelevant to any lawful purpose," *McPhaul v. United States*, 364 U.S. 372, 381 (1960) (citation omitted), which he cannot. The only other requirement is that the subject matter of the legislative inquiry be "one on which legislation *could* be had." *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927) (emphasis added). The district court correctly found that the purposes articulated by the Committee were "clearly sufficient to justify the subpoena and thereby end th[e] Court's inquiry." ECF 44 at 12.

As described above, the Committee seeks to assess whether there is a problem of current and former Presidents becoming subject to politically motivated prosecutions, as well as whether federal funds have been or should be used for the purpose of investigating former or current Presidents. Appellant would have this Court look past the Committee's asserted purpose and engage in its own examination of what Appellant alleges, in their view, is the *actual* purpose by questioning the stated motives of the Committee. App.'s Mem. at 31. The district court properly declined to engage in this unconstitutional exercise and so too should this Court. *See* ECF 44 at 13 ("The Court is required to presume that a congressional committee's stated legislative object is 'the real object.'" (citing *McGrain*, 273 U.S. at 178)).

Appellant advances three arguments to support his claim that the Committee's subpoena is invalid. Each fails.

*First*, Appellant argues that under *Kilbourn v. Thompson*, 103 U.S. 168 (1881), the subpoena is invalid because Congress cannot interfere with pending judicial proceedings. App.'s Mem. at 31-32. Appellant's reliance on *Kilbourn* is misplaced. This Court has already recognized that the case law, including *Kilbourn*, requires a high degree of deference be accorded to actions taken solely by Congress. *Trump v. Deutsche Bank AG*, 943 F.3d 627, 638 (2d Cir. 2019) (citing *United States v. Rumely*, 345 U.S. 41, 46 (1953)). In *Rumely*, the Supreme Court arguably limited *Kilbourn* to its specific facts, noting that it used "loose language" and has been subject to "weighty criticism and inroads from later cases." 345 U.S. at 46 (citing James M. Landis,

*Constitutional Limitations on the Congressional Power of Investigation*, 40 Harv. L. Rev. 153 (1926); *McGrain*, 273 U.S. at 170-71; and *Sinclair v. United States*, 279 U.S. 263 (1929)). Specifically, *Rumley* cautions that "[w]henever constitutional limits upon the investigative power of Congress have to be drawn … [e]xperience admonishes us to tread warily in this domain." *Id.*

In any event, *Kilbourn* is easily distinguishable.  There, the House could not identify a federal legislative interest that its constitutional powers could redress, rather only a judicial one.  Contrary to Appellant's characterizations, this Committee's investigation is not intended to "direct the progress of a pending judicial proceeding," or "regulate New York's enforcement of its own criminal law."  App.'s Mem. at 30. Rather, the Committee seeks to fully understand whether a problem involving politically motivated prosecutions of former Presidents is emerging, a subject upon which Pomerantz's testimony would be relevant, and the scope and effect that pursuing criminal indictments against former Presidents may have—especially given the significant federal interests implicated and the difficult legal questions raised—and to determine if federal legislation is needed to respond to those effects.  For example, one such complicated question is the effect, if any, that such potential criminal prosecutions may have on Presidents while serving in office.  If a President fears post-office criminal prosecution by locally elected prosecutors in retaliation for actions and decisions he takes while in office, would the President have an incentive to refrain from making decisions that may be in the national interest, but not in a particular local

interest, as a way of guarding against future criminal liability? Or would the President

have an interest in shaping his policy agenda to gain popularity in a particular

jurisdiction? Whether potential legislation is necessary and appropriate on this issue is

one of the many facets of this investigation that Appellant flatly ignores. Thus, the

Committee's subpoena here is well within its constitutional authority and clearly

differs from the one at issue in *Kilbourn*.

*Second*, Appellant refers to and relies on several federalism-related cases that he

argues protect New York's sovereign authority over its own laws. *See* App.'s Mem. at

34-35; ECF 8 at 9 (citing *United States v. Morrison*, 529 U.S. 598 (2000); and *New York v.

United States*, 505 U.S. 144 (1992)). None of these cases are applicable here because

the Committee's attempt to depose Pomerantz is not a use of federal authority

intended to delay, obstruct, or otherwise impede the pending criminal proceedings.

To be clear, Congress is not trying to block a pending state proceeding; rather, it is

Appellant who has gone to court to block a federal proceeding. Similarly, nothing

about the Committee's subpoena to Pomerantz constitutes an "unprecedented and

unlawful," App.'s Mem. at 30, infringement on the sovereignty of the State of New

York and its ability to enforce its laws, or an attempt to commandeer state officials to

perform federal functions. Indeed, two prosecutors from the Office have previously

appeared before a House Committee pursuant to subpoenas to discuss an

investigation. ECF 32-24 (statements of Joseph J. Dawson and Richard T. Preiss,

Assistant District Attorneys, New York County District Attorney's Office).

*Finally*, Appellant's allegation that the Committee has issued this subpoena "for the purpose of law enforcement" fares no better. App.'s Mem. at 35. As described above, the Committee has a legislative interest in issues within its jurisdiction that are the subject of legislative proposals that have been introduced. *See* ECF 32-22 to 32-23. While the Committee's inquiry into whether there is a need to adopt legislation to help protect current and former Presidents from political prosecutions, and whether federal funds should be spent in such investigations may touch on issues related to criminal proceedings, this does not come close to establishing that the Committee itself is engaging in a law enforcement function. In circumstances like these, "when the purpose asserted is supported by references to specific problems which … could be the subjects of appropriate legislation, then [the Court] cannot say that a committee of the Congress exceeds its broad power when it seeks information in such areas." *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968). But, even if there were some attenuated effect on a criminal proceeding, the Supreme Court has been clear that is not enough to invalidate the Committee's legitimate legislative purpose. *See Hutcheson v. United States*, 369 U.S. 599, 618 (1962) ("[S]urely a congressional committee which is engaged in a legitimate legislative investigation need not grind to a halt whenever responses to its inquiries might potentially be harmful to a witness in some distinct proceeding, … or when crime or wrongdoing is disclosed[.]" (citation omitted)).

As discussed above, and consistent with the record here, there is no basis in law for this Court to question the legitimacy of the legislative purpose of the Committee's investigation. *See, e.g., Eastland*, 421 U.S. at 509 ("The wisdom of congressional approach or methodology is not open to judicial veto.").

## II. Appellant Has Failed To Establish A Likelihood Of Irreparable Harm

This Court should deny Appellant's Motion for the independent reason that he has not established that he will suffer irreparable harm from the Committee's deposition of "a *former* prosecutor," ECF 44 at 17, who has already published a book and given numerous television interviews about his work investigating the former President. Appellant must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22; *see also JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990) ("Likelihood sets, of course, a higher standard than 'possibility.'"). The injury can be neither "remote or speculative" but must be actual and imminent. *See JSG Trading*, 917 F.2d at 80. Further, Appellant must provide evidentiary support of irreparable harm; bare allegations and conclusory statements are insufficient.

### A. The Deposition Of Pomerantz, A Former Employee, Would Not Interfere With Any Criminal Proceedings

Appellant argues that the deposition would interfere with a criminal proceeding, App.'s Mem. at 14, but he has provided "no reason to conclude that a deposition of a former employee would interfere with [his Office] or any of its

ongoing prosecutions." ECF 44 at 17. The Office's prosecutions "will move forward in the ordinary course," *id.*, whether the Committee deposes Pomerantz or not.

If Appellant's concerns arise from the disclosure of any information, they lack credibility given the book that Pomerantz has already written and the interviews that he has already done. Moreover, unlike Pomerantz's very public disclosures, the deposition will be conducted, pursuant to the House's deposition rules, ECF 32-21, in private, with attendance restrictions. The deposition rules also provide procedural protections to the deponent and prescribe a process the Committee must follow before releasing any deposition information to the public. *Id.*

Even outside the deposition context, the D.C. Circuit has held that the "release of information to the Congress does not constitute 'public disclosure.'" *Exxon Corp. v. FTC*, 589 F.2d 582, 589 (D.C. Cir. 1978) (citation omitted). Indeed, "courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties." *Id.* Absent an "evident" showing that the Committee intends to make confidential information publicly available, third parties like Appellant have no right to an injunction that would prevent a subpoenaed party from disclosing information to Congress. *See id.* The Committee's mere possession of privileged information would not inflict irreparable harm on the Office. *See, e.g.*, *Utica Mut. Ins. Co. v. INA Reinsurance Co.*, 2012 WL 12874471, at *5 (N.D.N.Y. Nov. 6, 2012) (finding no irreparable harm because Appellant presented "nothing more than conclusory statements that … it has privileged information"), *R. & R.*

33

*adopted*, 2012 WL 12874470 (N.D.N.Y. Dec. 14, 2012); *see also In re Excel Innovations*,

502 F.3d 1086, 1098-99 (9th Cir. 2007) (conclusory allegations that privileged

communications could be revealed are insufficient to establish irreparable harm).  For

all of these reasons, the Committee's private deposition of Pomerantz would not pose

any actual or imminent injury to the integrity of an ongoing criminal proceeding.  *Cf.*

*Winters*, 555 U.S. at 375-76.

### B.     The Deposition Would Not Cause Any Confidentiality- or Privilege-Related Harm To The Office

Appellant's conclusory argument that the deposition would compromise grand

jury or privileged information fails for multiple reasons.  *See* App.'s Mem. at 14-15.

*First*, Pomerantz will have the opportunity to claim privilege on a question-by-

question basis during his deposition.  Appellant's argument is based on a

misunderstanding of how the Committee's deposition would proceed.  If Pomerantz

or his attorney(s) believed that he could not answer a specific question because of a

specific privilege, he would retain the ability to assert that privilege in the deposition

as the basis for declining to answer it.  This is exactly what the district court

contemplated.  ECF No. 44 at 21 ("[T]he deposition should proceed in the normal

course, question by question, and Pomerantz is free to object, personally or through

his counsel, and decline to answer any questions when (and if) appropriate."); *see also*

*Comm. on Judiciary, U.S. House of Reps. v. Miers*, 558 F. Supp. 2d 53, 106 (D.D.C. 2008)

("[The former White House counsel] is not excused from compliance with the

Committee's subpoena by virtue of a claim of executive privilege that may ultimately be made. Instead, she must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."); *Eastman v. Thompson*, 2022 WL 1407965, at *9 (C.D. Cal. Jan. 25, 2022) (explaining that a blanket assertion of privilege in response to a subpoena was "extremely disfavored").

Besides protecting any purportedly privileged material, this approach makes sense because Appellant does not and cannot claim that Pomerantz's responses to *all* of the Committee's questions will be covered by privilege. The Committee will surely ask him questions that do not involve purportedly privileged material in any way (e.g., inquiries about the circumstances that led him to work for the Office, conversations he had after leaving the Office, and so on). Appellant's "proposed absolute immunity would thus deprive Congress of even non-privileged information. That is an unacceptable result." *Miers*, 558 F. Supp. 2d at 106.

Appellant claims that the question-by-question approach would be insufficient because the Committee believes that Pomerantz waived privileges by publishing his book, suggesting that any attempt to invoke them would be futile. *See* App.'s Mem. at 16. To be clear, the Committee will consider any invocation of privilege and accompanying explanation on an individualized, question-by-question basis. But even if the Committee overrules a number of Pomerantz's objections, he may raise a privilege as a defense if the Committee decides to enforce the subpoena in court or if he is eventually charged with criminal contempt. *See, e.g.*, ECF 44 at 21-22. It is

difficult to see how Appellant would suffer actual or imminent harm from this approach.

This Court should also defer to the district court's reasonable judgment that Pomerantz's experience as an attorney and the legal assistance provided by his own highly capable lawyers are sufficient to protect any privileges that may still exist. ECF 44 at 20. Appellant's attempt to argue that the standard House deposition rules, which would only allow Pomerantz's own attorneys to attend the deposition, would somehow prevent Pomerantz from asserting any applicable privileges is unconvincing.

*Second*, Appellant has not carried his burden of showing that the deposition will even implicate privileged material. Starting with grand jury material, in the district court, Appellant "concede[d]" that Congressional Appellees "do[] not seek information protected by New York's grand jury secrecy laws.'" ECF 44 at 19. Pomerantz also professes that he authored his book in such a way to avoid violating the grand jury secrecy requirement. *Id.* at 20. Accordingly, there is no reason to think that Pomerantz would disclose events that occurred before a grand jury during his deposition.

Beyond grand jury material, Appellant lists other privileges in a couple of conclusory sentences. App.'s Mem. at 14-15. The Court should find that he waived those arguments by failing to develop them. *Zhang v. Gonzales*, 426 F.3d 540, 546 n.7 (2d Cir. 2005) (refusing to consider an argument when the party "devote[d] only a single conclusory sentence to" it); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir.

1998) ("Issues not sufficiently argued in the briefs are considered waived and normally

will not be addressed on appeal.").  Even if the Court considers the other privileges,

Appellant has not shown that they apply here, *see* ECF 27 at 19-22, and as the party

asserting privilege, Appellant has the burden to show its existence and applicability, *see*

*In re Grand Jury Proc.*, 219 F.3d 175, 182 (2d Cir. 2000).

 *Third*, if any privileges did apply to information that Pomerantz has already

discussed, the Office waived them by failing to take any steps to prevent Pomerantz

from speaking publicly about his work on the Office's investigation of former

President Trump.  *See Bus. Integration Servs., Inc. v. AT & T Corp.*, 251 F.R.D. 121, 124

(S.D.N.Y. 2008) (noting that when confidential attorney-client material is disclosed, it

is the privilege-claiming party's "burden to show that its privilege was not waived

through disclosure" (citation omitted)).

 Consider the attorney-client privilege.  It belongs to the client, and only the

client may waive it.  *See In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987).  But a client

may waive the privilege without disclosing the privileged material himself.  *See id.* at

100-01.  Indeed, when a third party discloses privileged material—even inadvertently

or without the client's express permission—the client waives the privilege unless he or

she takes reasonable steps to protect the privilege.  *See Madanes v. Madanes*, 186 F.R.D.

279, 293 (S.D.N.Y. 1999) (noting the client waived attorney-client privilege "[b]y

failing to take reasonable steps to maintain the confidentiality of [privileged]

documents" when they were "publicly filed without objection in legal proceedings" (citing *von Bulow*, 828 F.2d at 100-01)).

If Pomerantz disclosed privileged material in his book and numerous television interviews, Appellant waived the privilege unless he took reasonable steps to protect that information. *See von Bulow*, 828 F.2d at 101 ("It is not asking too much to insist that if a client wishes to preserve the privilege [when privileged communications are inadvertently disclosed], he must take some affirmative action to preserve confidentiality." (alteration and citation omitted)). But Appellant has not shown that he made a serious attempt to stop Pomerantz from disclosing any confidential material and thus waived any privilege that might have existed.[9] Had Appellant truly been concerned about irreparable harm from the release of this information, he could have taken some formal legal action to prevent Pomerantz from publishing his book or stop him from speaking about internal deliberations to the media. Appellant took no such action, even after seeing what was in the book. *See Martir v. City of New York*, 2009 WL 2355901, at *2 (S.D.N.Y. July 29, 2009) (reasoning that a delay in seeking injunctive relief regarding privileged documents "suggests the alleged irreparable harm … occasioned by" mere possession of the documents "is not 'imminent'" (citation omitted)).

---

[9] Nor does the Office's email to the City's Department of Investigation change the analysis. *See* ECF 44 at 23 n.16.

The district court rejected Appellant's argument that Pomerantz's disclosures could not have waived privilege, finding it was "belied by [the Office's] inaction in response to Pomerantz's *known plan* to publish a book about [the Office's] investigation into President Trump." ECF 44 at 22-23. The court went on: "Because Bragg has *never* claimed that any information in the book was privileged, he may not do so now simply because it is convenient." *Id.* at 24. Appellant offers no serious critique of the district court's opinion and cites no case that he says compels a different result, apparently believing that sending a lone letter reminding Pomerantz of his obligations and requesting prepublication review was enough to preserve the privilege. *See* App.'s Mem. at 16-17. In sum, "[Appellant] cannot seriously claim that any information *already published* in Pomerantz's book and discussed on prime-time television in front of millions of people is protected from disclosure as attorney work product (or otherwise)." ECF 44 at 22.

*Finally*, while Appellant argues that the deposition "risks creating extra-judicial evidence and pre-judging legal issues," App.'s Mem. at 18, vague speculation about the "risks" of creating evidence for some future action or about some other decisionmaker "pre-judging" issues is far too remote. Likewise, Appellant's claim that the subpoena "risks chilling decisions by prosecutors and witness[es] in the pending criminal prosecution that is the target of the subpoena, as well as future investigations and proceedings" is unsubstantiated conjecture. App.'s Mem. at 19. The Court

should decline to entertain Appellant's unsupported predictions of future generalized harm.

**C.    The Deposition Would Not Inflict Any Harm On The Office's "Dignitary Interests"**

Finally, the deposition will not harm state "dignitary interests" because it in no way usurps New York's ability to prosecute or investigate the conduct at issue, nor would it "subordinate" New York's sovereign interests.  App.'s Mem. at 21. Appellant's hyperbolic attempts to reframe the Committee's inquiry shed no light on how the private deposition of a *former* employee would irreparably harm New York's sovereignty.  As with Appellant's other supposed irreparable harms, he has not provided any specific evidence to support his bare allegation.

Appellant's concern is, at best, speculation about events that could occur after the deposition, not about the deposition itself.  *See Winter*, 555 U.S. at 375-76.  These rehashed arguments do not support the notion that a Congressional deposition of a former State employee would irreparably harm New York's sovereign interests. Additionally, Appellant makes "much of the sovereign character of the State of [New York], but neglect[s] to note that the right of Congress to use compulsory process in aid of its investigations also enjoys a certain dignity within our governmental system." *Harris v. Bd. of Govs. of Fed. Rsrv. Sys.*, 938 F.2d 720, 723-24 (7th Cir. 1991).  The other cases cited by Appellant involve enjoining a state statute, *Maryland v. King*, 567 U.S. 1301, 1303 (2012), and enjoining a state from conducting elections, *Abbott v. Perez*, 138

S. Ct. 2305, 2324 (2018)—worlds apart from the facts at issue here. The subpoena would not prevent the State of New York from doing anything; it would simply require a former state employee to answer questions in a deposition.

## III. The Balance Of Equities And Public Interest Favor Congressional Appellees

The balance of equities and public interest strongly weigh in favor of prompt compliance with a duly issued Congressional subpoena. In considering the balance of equities and public interest, because Congressional Appellees are the federal government, these last two factors "merge." *See Nken*, 556 U.S. at 435. The Court "must balance the competing claims of injury," paying "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Here, each day of delay harms the Committee by depriving it of important information it needs to carry out its constitutional responsibilities. And each day that the Committee's subpoena is the subject of an injunction issued by a coordinate branch of government harms Congress by subjecting it to an unconstitutional action from which it is immune by the Speech or Debate Clause. These injuries outweigh any harm Appellant would suffer from Pomerantz's compliance with the subpoena.

Although Appellant styles its motion as one for a stay, its request to alter the status quo by rendering the Committee's subpoena unenforceable is really a request for an injunction. Such relief would, itself, improperly usurp the Committee's

constitutional power to investigate and conduct oversight.  Rather than respecting the

Committee's clear Article I authority to subpoena Pomerantz, Appellant asks this

Court to inject itself into the Committee's investigation and decide, without any basis,

whether the Committee needs this information now or later.  That is neither

Appellant's nor the Judiciary's prerogative.  Indeed, the Speech or Debate Clause

prevents this very type of outside inquiry, let alone an attempt to exert power over the

Committee's investigatory decision making.

Moreover, the "purposes which the Clause serves require" expeditious denial

of Appellant's motion "because one branch of Government is being asked to halt the

functions of a coordinate branch." *Eastland*, 421 U.S. at 511 n.17.  Indeed, the

Supreme Court noted in *Eastland* that the lengthy delays in that case where courts

blocked a subpoena in a challenge that was ultimately unsuccessful "illustrates vividly

the harm that judicial interference may cause." *Id.* at 511.  "A legislative inquiry [was]

frustrated for nearly five years, during which the Members and their aide [were]

obliged to devote time to consultation with their counsel concerning the litigation,

and [were] distracted from the purpose of their inquiry." *Id.*  While Appellant relies

on the history of the *Eastland* line of cases as support for enjoining or staying a

Congressional subpoena, *see* App.'s Mem. at 22, he ignores: (1) that the two stays

issued by the lower courts in *Eastland preceded* the Supreme Court's pronouncement in

1975 that the issuance of a subpoena is a legitimate legislative act immunized by the

Clause; and (2) the Court's criticism of the harms that the judicial interference in that line of cases had caused.

A judicially imposed delay also would hamper the Committee's ongoing investigation, inflicting the legally protectable harms of loss of information and the institutional diminution of subpoena power on the Committee. *See Miers*, 558 F. Supp. 2d at 71. There is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress," and "the investigatory power is one that the courts have long perceived as essential to the successful discharge of the legislative responsibilities of Congress." *Exxon Corp.*, 589 F.2d at 594. Even in the less-pressing context of statutory-based administrative investigations, there is "a strong public interest in having [such] investigations proceed 'expeditiously and without impediment.'" *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Res. Trust Corp.*, 5 F.3d 1508, 1514 (D.C. Cir. 1993) (citation omitted). The public interest in expeditious and unimpeded Congressional investigations—the authority for which is derived from the Constitution itself—is even more compelling. *Cf. Exxon Corp.*, 589 F.2d at 593-94.[10]

_____

[10] In addition, the cases Appellant cites in which the return date for a subpoena for *documents* was postponed for a short time do not illuminate the disruption caused by judicial delay of a *deposition*, for which the scheduling and logistics can be complicated in consideration of myriad factors, including Members' schedules, votes on the House Floor, other Committee priorities, and the time needed to prepare for the deposition. *See* App.'s Mem. at 24-25. Moreover, the assertion and resolution of privilege claims with respect to document subpoenas is fundamentally different from the manner in

Appellant's attempt to create a standard whereby the Committee can only take "emergency" depositions in the normal course of its investigations is not supported by any case law. *See* App.'s Mem. at 22-23. It is not Appellant's prerogative to decide how immediately the Committee needs certain information or whether "an emergency … requires" it. App.'s Mem. at 23. This Court should decline Appellant's invitation to create an "emergency" standard out of whole cloth. No outside entity, whether a subpoena recipient like Pomerantz, or his former employer, is permitted to challenge "the wisdom of the congressional approach or methodology." *Eastland*, 421 U.S. at 509. The relevant inquiry is, instead, whether the deposition subpoena is a legitimate legislative act; because the Committee has demonstrated that it is, that is "the end of the matter." *Brown & Williamson*, 62 F.3d at 418 (citations omitted).

Further delay also limits the House's ability to fulfill its constitutional duties more generally. "[T]he House, unlike the Senate, is not a continuing body[.]" *Eastland*, 421 U.S. at 512. The time for the Committee to consider and act upon information it learns from the Pomerantz deposition will expire at the end of this Congress, on January 3, 2025. And, although there is no requirement that the

_____

which privilege claims are asserted and resolved in a deposition, making the case for any delay of a deposition substantially weaker. Finally, each Committee makes independent litigation decisions, and this is not the only case where a House Committee has opposed requests for a stay or injunction pending appeal. *See, e.g.*, *RNC v. Pelosi,* 1:22-cv-00659-TJK, ECF 39 (D.D.C. May 6, 2022) (opposing motion for injunction pending appeal); *Trump v. Thompson*, 1:21-cv-02769-TSC, ECF 42 (D.D.C. Nov. 10, 2021) (same).

Committee identify specific proposals to justify its subpoena, *In re Chapman*, 166 U.S. 661, 670 (1897), its need for the subpoenaed information is all the more pressing because legislative proposals related to the Committee's investigation have been introduced. Congress "cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change," *McGrain*, 273 U.S. at 175, and legislation cannot be enacted overnight. Any judicially imposed delay would significantly hinder the Committee's ability to evaluate and act upon information from Pomerantz's deposition.

On the other side of the ledger, Appellant does not articulate any valid reason why any harm he would suffer without an injunction pending appeal would outweigh the harms to the Committee, the Congress, and the public if an injunction were granted. As explained above, Appellant does not establish that the deposition of Pomerantz would cause any actual and imminent irreparable harm. Accordingly, this Court should decline Appellant's request to enjoin the deposition from occurring, no matter how he styles it.

## CONCLUSION

For the foregoing reasons, Appellant's application should be denied. However, if the Court were to grant it, Congressional Appellees respectfully request that the Court consider the underlying appeal in an expedited manner.

Respectfully submitted,

Matthew Berry
   *General Counsel*
Todd B. Tatelman
   *Deputy General Counsel*
Brooks M. Hanner
Sarah Clouse
Bradley Craigmyle
   *Associate General Counsels*
OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC 20515
(202) 225-9700

*Counsel for Congressional Defendants-Appellees*

April 21, 2023

## CERTIFICATE OF COMPLIANCE

This response complies with Federal Rule of Appellate Procedure 27(d)(2), (e)because it contains 10,372 words. This motion also complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it is prepared in a proportionally spaced typeface using 14-point Garamond type.

*/s/ Matthew Berry*
Matthew Berry

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2023, I caused the foregoing to be filed via the CM/ECF system for the U.S. Court of Appeals for the Second Circuit, which I understand caused a copy to be served on all registered parties.

*/s/ Matthew Berry*
Matthew Berry